## Case No. 8,020.

### LAMB et al. v. PARKMAN.

[1 Spr. 343;[1] 20 Law Rep. 186.]

District Court, D. Massachusetts. Feb., 1857.

CHARTER PARTY—WHOLE CAPACITY OF SHIP—DISTINCTION BETWEEN CARRIER AND BAILEE TO TRANSPORT—USAGE IN LOADING — DAMAGE FOR INJURY TO GOODS—PROPER SKILL AND CARE.

1. Under a charter-party giving to the hirer the whole capacity of the ship, the owner thereof is not a common carrier, but a bailee to transport for hire.

[Cited in Sumner v. Caswell, 20 Fed. 251.]

2. A charter-party for the transportation of a cargo of merchandize from Calcutta to Boston, prescribing no mode of stowage, tacitly refers to the established and known usage of the trade, for the manner of stowing the cargo.

[Cited in The Titania. 19 Fed. 108; The City of Alexandria, 23 Fed. 829; The Dan, 40 Fed. 693.]

3. A usage in such trade to load vessels at Calcutta, with full cargoes, including gunny cloth and gunny bags, close up to the upper deck, without dunnage or air space at the top. is valid; although gunny cloth thus stowed is liable to damage from the condensation of vapor on the under side of the upper deck.

[Cited in The Chasca, 23 Fed. 159.]

4. Under a charter-party. by which the ship-owner undertakes to stow the cargo at Calcutta, and bring it safely to Boston. perils of the sea only excepted, he will not be liable for such damage.

5. The liability of a ship-owner to a charterer of the entire vessel. will not be varied by the fact, that the master gives a bill of lading. in common form. for the cargo taken on board under the charter-party.

6. Under the common bill of lading, the carrier is exempted from liability, not only for loss occasioned by perils of the sea, but also for damage or deterioration arising from the nature of the article and voyage.

[Cited in Janney v. Tudor Co.,3 Fed. 816; The T. A. Goddard, 12 Fed. 177.]

7. But if there has been a want of proper skill and care, on the part of the carrier, in guarding against such dangers, damage will be ascribed to negligence, and not to the perils of the sea, or the nature of the article and voyage.

[Cited in The Cheshire. Case No. 2,658; The Invincible, Id. 7,056; Mainwaring v. The Carrie Delap. 1 Fed. 878; The T. A. Goddard, 12 Fed. 178; The Titania, 19 Fed. 104.]

This was a libel in admiralty, by [Thomas Lamb] the owner of the ship Napoleon, to recover a balance of freight due on a charter-party from Calcutta to Boston. The contract was in the usual form, and contained the clause, "dangers of the seas, fire and navigation excepted." The owners were to victual and man the vessel, appoint the master, keep the vessel tight and stanch, and stow the cargo, and deliver it to the respondent in Boston. The respondent [Powell M. Parkman], on his part, was to furnish a "full cargo," including broken stowage, and was to pay by the ton. $13.50 for whole packages, and $6.75 for broken stowage. The respondent furnished, at Calcutta, a cargo consisting. in part, of gunny cloths and

1 [Reported by F. E. Parker. Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

gunny bags, in bales. The upper tier in the between-decks, consisted of these bales, which were screwed close to the beams of the upper deck, with no dunnage or other protection, and no air space between them and the deck. Between the beams and carlines, up to the deck, were stowed pockets of linseed. In discharging the cargo, it was found that the upper tier of bales in the between-decks was damaged. This damage was chiefly to the upper cloths in the bales. The interior of these bales, as well as the entire contents of all the bales that did not come in contact with the deck were uninjured. The respondent paid all the freight, except $1,233, which he claimed to deduct, on account of the damage to the cargo.

The libellants introduced evidence tending to show that there is a usage in the trade between Calcutta and Boston, to stow full cargoes of Calcutta goods, including gunny cloths and gunny bags, close to the beams, without mats or air-space. This was met by counter testimony on the part of the respondent. There was a great amount of testimony on other points referred to in the opinion.

T. D. Eliot, for libellants.

1st. The contract is merely a letting of the capacity of the vessel, and of services and labor in receiving, carrying, and delivering cargo. The libellants are merely bailees or carriers for hire, and liable only for negligence. Ang. Carr. § 89; Story, Bailm. §§ 495, 504.

2d. By the terms of the contract, the respondent is to furnish a full cargo. This, under the usage of the trade, gave the libellants the right to stow the bales close up to the beams, without matting or air-space.

3d. If the bill of lading varies the contract, it is not binding on the owners, and cannot enlarge their liabilities.

4th. If the owners are common carriers, and liable as on a bill of lading, still the damage in this case is from natural causes, like fermentation, or evaporation, for which the common carrier is not liable.

5th. The burden is on the respondent to show negligence. Ang. Carr. 61; Clark v. Barnwell, 12 How. [53 U. S.] 272; Fland. Shipp. 199; Smith, Cont. 30, 31.

6th. The usage is sufficiently proved, and is reasonable and binding. Ang. Carr. 57, 231, 301; Gracie v. Maryland Ins. Co., 8 Cranch [12 U. S.] 77; Rich v. Lambert, 12 How. [53 U. S.] 347; Baxter v. Leland [Case No. 1,125]; Sturgis v. Cary [Id. 13,573]; Adrian v. The Live Yankee (U. S. Dist. Ct. Cal.) [Id. 88].

R. H. Dana, Jr., for respondent.

1st. The true construction of the contract is, that the ship-owner assumes the known and well defined and established duties of a carrier under a bill of lading. This is the only signification that can be given to the clause, "dangers of the seas and navigation excepted." This exception is the first, general, governing clause, anterior to all the covenants. The ship-owner victuals, mans, provides his own master, and has a lien on the cargo for freight money. It is a contract for the safe carriage and delivery of goods, against all but the expressed or implied exceptions known to contracts of common carriers by sea, with special stipulations as to quantity and kinds of cargo, demurrage, &c. The Casco [Case No. 2,486]; Abb. Shipp. 289, note. It is probable that the ship-owner assumes these duties, since the shipper has no security, no oversight, no right to direct or control, no opportunity to obtain impartial evidence, to insure activity, to prevent preferences; and because it is the usual security of shippers in vessels which they have no control over. It is probable also from the fact, that the stipulation for "full cargo," has a restriction protecting the ship, but no reciprocal restriction guarding the cargo. The Casco, ubi supra. This contruction is aided by the invariable usage, to give bills of lading under these charters.

2d. The only express exception is "dangers of the seas." The burden is on the ship-owners, to show that the injury was done by a cause within the exception. Clark v. Barnwell, 12 How. [53 U. S.] 272; The Martha [Case No. 9,145]; Hunt v. The Cleveland [Id. 6,885]; The Uriel, 10 La. Ann. 413; Ang. Carr. § 472; 1 Smith, Lead. Cas. 280, note. The proximate cause of damage set up is external injury to the bales of goods, from water on the inside of the upper deck and beams, against which the goods were stowed close. The evidence shows conclusively that the injury was not caused by the general heat, sweat, and steam of the hold, operating on the susceptible nature of the goods. No gunny cloths were injured, except those that came in contact with the inside of the upper deck. The cause set up is not a "peril of the seas." It is not extraordinary. It is the usually apprehended result of the uniform action of natural causes. Thus, the law never classes among "dangers of the seas," the usual rolling of the vessel, sea air, worms, rats, changes of climate, or the usual heat, steam, dampness, or darkness, or closeness of the hold. Baker v. Manufacturing Co. [12 Gray, 603]; Hazard v. New England Marine Ins. Co., 8 Pet. [33 U. S.] 557; Rohl v. Parr, 1 Esp. 445; Story, Bailm. 512, 618; 1 Smith, Lead. Cas. 283, note; Siordet v. Hall, 4 Bing. 607; Ang. Carr. 161, 167; 3 Kent, Comm. 300; Marsh v. Blythe, 1 McCord, 360; The Reeside [Case No. 11,-657].

3d. The cause of injury does not come within any implied exception. No act of God, or of the public enemies, no internal or general decay, is pretended. It is external injury from water formed under the upper deck. The true definition of the im-

plied exception is, the inevitable operation of general laws of nature. This operation may be solely at sea, or chiefly at sea, or equally at sea and on land. The criterion is, that the operation of the law is inevitable. Whether by inevitable is meant literally that no imaginable expense or exercise of skill, or labor, might possibly prevent the loss, it is not necessary to inquire; for this case clearly comes regularly within the province and scope of the exercise of usual skill and foresight. Theft, robbery, misdelivery, loss, accidental fire, fraud of servants, are always held to come within this scope and province. As to all these, the carrier is an insurer. Siordet v. Hall, 4 Bing. 607. The cause of loss here comes within this province, for it is to be anticipated, and may be guarded against by the manner of stowage. It is for the ship-owner so to stow his cargo, that goods liable to injury by wet, shall not be placed, without protection, against parts of the ship which are known to be liable to wet. The burden must be on the ship-owner, to bring the cause of loss within the implied exception; as it is to bring it within the express exception. See cases cited, supra. Clark v. Barnwell, 12 How. [53 U. S.] 272, and Adrian v. The Live Yankee (U. S. Dist. Ct. Cal.), were instances of the general effect of dampness in the hold, upon the susceptible nature of the goods, and seem to have been treated as coming within the implied exception of the general operation of natural laws, not to be guarded against by any demandable exercise of skill or labor. This distinguishes them from the present case.

4th. The usage set up is bad, because: (I.) It varies the contract, by introducing a third exemption, when there is neither latent nor patent ambiguity, and when the law is neither silent nor uncertain. The Reeside [supra]; Abb. Shipp. 379; Linsley v. Lovely, 26 Vt. 123; Wadsworth v. Allcott, 2 Seld. [6 N. Y.] 64; Foye v. Leighton, 2 Fost. [22 N. H.] 71. (II.) It changes a settled rule of commercial law, ancient and universal, by a usage local, not of long continuance, and confessedly not uniform. The Reeside [supra]; Bowen v. Newell, 4 Seld. [8 N. Y.] 190; Otsego Bank v. Warren, 18 Barb. 290; Citizens' Bank v. Nantucket Steamboat Co. [Case No. 2,730]; Hone v. Mutual Safety Ins. Co., 1 Sandf. 137; Merchants' Bank v. Woodruff, 6 Hill, 174; Abb. Shipp. 379; 2 Pars. Cont. 59, note. (III.) It is unreasonable, as it exempts the carrier, in a point touching his own care and skill, over which the shipper has neither control nor oversight, in favor of the carrier's pecuniary interest, and against the shipper. Cases supra on usage; Macy v. Whaling Ins. Co., 9 Metc. [Mass.] 362; Ang. Carr. 229, 230, 301; The Paragon [Case No. 10.708]. (IV.) It is recent, fast decreasing, never uniform, not even general. (V.) It has never been acquiesced in. (VI.) It relates to a matter of detail of stowage, as to which shippers have no need to inquire or inform themselves. (VII.) It is uncertain, depends on circumstances, and is not precise nor uniform in its operation. In Baxter v. Leland [Case No. 1,125], it does not appear that the admission or effect of evidence as to usage was contested, and the defence was put on the ground of negligence; and the terms of the contract are not disclosed.

5th. The bill of lading is given in pursuance of, and is incorporated into, this contract. By it the libellants undertake to deliver the goods "in like good order and condition," unless they can prove the loss to have come from a cause against which they are not insurers.

6th. The damages for injury to the goods may be deducted from the freight due by the contract, and the respondent is not driven to a cross-action. Snow v. Carruth [Id. 13,144]; The Hudson [Id. 6,831]; Thatcher v. McCulloh [Id. 13,862].

SPRAGUE, District Judge. The libellants, owners of the ship Napoleon, on the 11th of January, 1855, let that ship by a charter-party of affreightment to the respondent, a merchant of Boston, engaged in the Calcutta trade, for a voyage from Boston to Calcutta. By the covenants of the charter-party the owners were to victual and man her, but the whole capacity of the ship for cargo was let to the respondent, who was found to furnish a full cargo from Calcutta to Boston, including broken stowage, and was to pay $13.50 per ton weight or measurement, for whole packages, and $6.75 per ton for broken stowage. The ship proceeded on her voyage, and at Calcutta the respondent's agent furnished, and the master of the ship took on board, a full cargo of Calcutta goods. The upper tier of whole packages between decks consisted of bales of gunny bags and gunny cloth, which came up to, and were screwed in under the beams, and the space above these, between the beams and car-lines, up to the deck was filled with loose stowage, consisting of pockets of linseed, without any space left for ventilation, or any covering, excepting a few mats. With this cargo the ship sailed from Calcutta, or rather the Sand Heads, on the twenty-first day of August, 1855. On her passage, she encountered heavy gales and much severe and tempestuous weather, and did not arrive in Boston, until the 28th day of February, 1856. Upon discharging her cargo, it was found to be damaged, partly by sea-water, which, however, was to no great extent, the principal injury being what is known in that trade as the steam or sweat damage, which is found in the upper part of the cargo, between decks. The delivery of the cargo to the respondent was completed on the seventh of March. On the seventeenth he paid to the libellants all the hire, or freight money, excepting the sum of $1,233, which he subsequently claimed to retain, on the ground of damage to the cargo

by steam or sweat. In order to recover the sum thus withheld, this suit was commenced. The answer, which was filed on the sixteenth day of May, 1856, asserts the right to retain that sum on two grounds: First, that "by reason of the improper stowage of cargo in said ship, at Calcutta, there was a want of proper ventilation of the same in the hold, and that by reason thereof certain goods of the respondent were damaged." Second, that the captain signed the bill of lading at Calcutta, in the usual form, and that the libellants thereby became bound to deliver the cargo in Boston, in good order, perils of the seas and navigation only excepted; but that they were not so delivered, though they were not injured by said perils, but that certain goods were damaged.

It appears by the evidence, that three-fourths, at least, of all the merchandise imported into the United States from Calcutta are brought into the port of Boston, and that almost all the cargoes are more or less affected by this steam damage, as it is called; that those arriving in the cold months are more injured than those which arrive in the warm months; but that vessels arriving at the same time, differ materially in the amount of this damage. It has not been shown, that the amount of injury in the present case is unusual; indeed, that inquiry has not been gone into; the question intended to be tried being, whether the loss arising from this kind of damage shall be borne by the shipper or the carrier. The most intelligent witnesses ascribe this kind of damage to the condensation of vapor in the hold, by the transition from a warm to a cold climate, producing moisture directly under the upper deck, which injures the upper part of the cargo.

At the trial, there was a great deal of evidence, as to the usages of the Calcutta trade and particularly as to the mode of stowing the upper part of the cargo between decks. This matter was earnestly contested, and occupied much time, but not more, perhaps, than its decisive importance warranted. The court has had the benefit of the testimony of many most intelligent witnesses from the various classes of persons conversant with this trade,—ship-owners, importers, port-wardens, stevedores, and ship-masters. After a careful consideration of all the evidence, I think that it clearly proves a usage to stow cargoes in the Calcutta trade, consisting of the same kind of goods as this, in the same manner as this cargo and these goods were stowed; and this usage is proved not merely by a preponderance of evidence, but beyond a reasonable doubt, to have existed at the time this contract was made. Two port-wardens and two stevedores were called, who, from their testimony, had examined the stowage of more Calcutta cargoes than all the other witnesses, and testified in the most unequivocal terms to such a usage, and their testimony is sustained, in equally strong terms, by the ship-owners and ship-masters. The importers who were called by

the respondent, were questioned only to the mode of stowage for two years, prior to March, 1856, and according to their testimony, three-fourths of the cargoes were, during that time, stowed in the same manner as this cargo was. Now it is to be observed, that that term of two years goes back only ten months prior to the making of this contract, hardly the length of a Calcutta voyage, and if during those two years, a change in the mode of stowage had been going on, and still three-fourths of the whole were like the present, it may reasonably be inferred, even from this testimony in behalf of the respondent, that a still greater proportion was stowed in that manner, during the first ten months of the two years. It was further clearly proved, that this kind of damage had always been borne by the shipper, and never by the ship-owner. The importers testify that, till within three or four years last past,—that is, one or two years before this contract was made,—the underwriters paid for this kind of damage, and thus the shipper, although he bore the loss in the first instance, was indemnified. But he paid for that indemnity in his premium of insurance. It appears that, some years since, the insurance offices in Boston introduced a new clause into their policies, to exclude liability for this kind of damage. The importers further testify, that after the insurers refused to pay, the shippers complained of this kind of damage to their goods, but, nevertheless, paid the freight, and they believe that these complaints must have been generally known to the ship-owners; but, although inquired of, they state no instance, before this contract was made, of the payment of the freight under protest, either written or verbal, or of a distinct claim upon any ship-owner for this damage.

The question before the court is, whether there was a want of proper skill and care in stowing the cargo. Improper stowage is distinctly set up in the answer, as the first ground of defence. Now, it having been shown that this cargo was stowed in accordance with an established usage, why is not that decisive in favor of the libellants? It has been earnestly and ably contended, that it is not; but that this usage is of such a character that it is to be rejected and disregarded. What is its character? It is a usage as to the mode of stowing a cargo of merchandize for a sea voyage; a usage of trade as to the details in the mode of carrying it on. It violates no rule of law, or principle of public policy, but is a matter of business between private individuals, to be regulated by them. There is no controversy that the parties may make a contract for any mode of stowage which they may see fit. What contract have they made in this respect? In the absence of expressed stipulations, the usage of the trade answers this question; to that usage the contract tacitly refers, not to contradict, or vary its terms, but for expounding its meaning, and supplying details in the mode of its execution. Let us look into this charter-party. It contemplates

the conveyance by sea, of a full cargo of great value, by a long voyage, and yet not a word is said as to the manner in which that cargo shall be protected, at the bottom, at the sides, or on the top. Not one word is said, as to the navigation of the ship, by how many, or what kind of officers and seamen, or sails, or rigging, or other essential requisites for the voyage. The contract being silent in this respect, how are the rights and duties of the parties to be ascertained? The answer is,—by the usage of the trade. Suppose a question had arisen, whether this cargo was sufficiently protected by dunnage at the bottom or sides, must it not have been decided by usage? And if so, why not also as to the top? It must be presumed, that the parties intended that this cargo should be stowed throughout in the usual manner. This was their contract, and if the libellants had departed from it, and stowed the goods in an unusual manner, either by leaving a space, or placing a covering above it, and damage had been caused thereby, he must have borne the loss. By this very charter-party, the respondent was bound to furnish, and the libellants to receive, a full cargo, including loose stowage. Now it has been conclusively shown, that loose stowage is intended to fill whatever space is not occupied by the whole packages, both in the body of the cargo and above, even between the beams and carlines, quite up to the deck. And by the contract, this loose stowage was to consist either of pockets of linseed, ginger, nux vomica, turmeric, bundles of twine, or loose gunny bags, a part of each or either, at the option of the respondent. He chose to furnish pockets of linseed, which would not protect the cargo from damage, as would the ginger, or single gunny bags, which are absorbents of moisture. But the libellants were bound to receive those pockets of linseed, to the full capacity of the ship, stowing them in the usual manner, that is, filling all the space above the whole packages.

But, it is insisted that this usage is so unreasonable and so injurious to the shipper, that he ought not to be bound by it. The merchants and ship-owners engaged in the Calcutta trade are second to none in intelligence and integrity, and it would be not a little surprising, if they had for many years acquiesced in, and established a usage so injurious to one party, and that after a contract had been made and executed under it, the court must set it aside. But is this mode of stowing the cargo injurious to the shipper? This is a question which I have no sufficient means of determining. Upon the evidence, there are two difficulites in doing so. First, would any, and if any, what, other mode of stowing prevent this steam damage? Second, would the expense to the shipper of such mode exceed the benefit? The only modes suggested are ventilation and matting. There is a diversity of opinion among the witnesses, as to the cause of this steam and sweat, and still greater as to the means of preventing the damage. Some think that a remedy may be found, by leaving a space for the circulation of air, others, by matting. Some are in doubt, which of the two; and others think that neither would be effectual or useful.

In his original answer, the respondent relied solely upon ventilation. As to which it may be remarked, that if the shipper is to have the whole capacity of the ship for the benefit of his cargo, he must in some form pay for the whole. If the mode of compensation is by the ton, then the smaller the number of tons he is to put on board, the greater must be the rate. As the shipper, then, is to purchase the whole capacity, will it be for his interest to leave a space below the upper deck, down to some inches below the beams, or, for any distance, for the circulation of air? In other words, is or is not the value of that space greater than the damage which would arise from filling it with goods? It appears by the evidence, that the freight of gunny bags, for example, is more than twenty-five per cent. of their value here. Now if damage should arise from filling that space with gunny bags, still, if it did not equal twenty-five per cent. of their value, it would be for the interest of the shipper so to fill it. How that would be, I have no means of determining. It is a question which must be left to the parties, and to be settled by them, when they make their contract. And so also of matting.

It is contended, in behalf of the respondent, that the libellants were common carriers. By the charter-party, the whole ship was let to the defendant, who was to furnish a full cargo, and the owners had no right to take goods for any other person. In no sense were they common carriers, but bailees to transport for hire, and, as such, bound to the use of ordinary skill and care. The measure of this care, as generally expressed, is that which a prudent man, of ordinary skill, would use in his own business. And here again the usage becomes conclusive, for independent of its being, by tacit reference, a part of the contract, it shows what prudent and skilful men have done in their own business for many years.

But it is insisted, that under such a charter-party, it is the practice for masters to give a bill of lading at Calcutta, in the usual form, and that as this was done in the present case, the owners thereby became insurers against all losses, not coming within the express or implied exceptions. Without pausing to inquire what would be the rights of an assignee, I apprehend that, as between the original parties, the bill of lading must be deemed a receipt, or acknowledgment of the goods taken on board, without varying the obligations of the charter-party. But suppose, that by virtue of this usage, the bill of lading is imported into the original contract, is not the usage for the shipper al-

ways to bear this steam damage also imported into the contract? If usage creates liabilities by giving a bill of lading, does not usage also limit those liabilities to the exclusion of the present claim? But independently of this view, what are the liabilities of the carrier, under the bill of lading? By the express exceptions, he is not responsible for loss or injury arising from the perils of the sea or navigation, and the law also exempts him from liability for damage or deterioration arising from the nature of the article, and its confinement in the hold during the voyage. If, indeed, there has been a want of proper skill and care on the part of the carrier, in guarding against these dangers, the loss is ascribed to negligence, and not to the perils of the sea, or the nature of the article and voyage.

Now it is apparent, that the damage in the present case arose either from the force and effect of the sea, or navigation, or from the nature of the article and its confinement in the hold during the voyage, or from both these causes, and in either case, the carrier is not responsible, unless there was a want of proper care or skill on his part. Thus we are brought again to the question of negligence in the stowage of the cargo. That question has already been considered, and is conclusively settled by the usage. Many cases might be referred to. I shall cite but two. In Baxter v. Leland [Case No. 1,125], a general ship took on board, at New Orleans, a quantity of flour, under the common bill of lading, for a voyage to New York. The flour was stowed upon hogsheads of sugar and under sacks of corn, and was damaged by such stowage. But it being shown that it was the usage to . stow flour in that manner, in voyages from New Orleans to New York, and other northern ports, it was decided that the shipper was bound by the usage, and that the carrier was not responsible for the damage. This decision was made in the district court of the United States, in New York, and afterwards affirmed by the circuit court in the same district. In Clark v. Barnwell, 12 How. [53 U. S.] 272, a quantity of cotton thread was shipped at Liverpool, under a common bill of lading, for a voyage to Charleston, South Carolina. On its arrival, the thread was found to be stained and spotted by dampness and mould, caused by the humidity of the atmosphere of the hold, in a long and boisterous passage, and the transition from a colder to a warmer climate. The court held, that this damage was caused by perils of the sea, and that the carrier was not responsible, unless he had been guilty of negligence, and that the burden of proving negligence rested upon the shipper. It appeared that two thousand bags of salt constituted a part of the cargo, and it was insisted in behalf of the shipper, that the carrier was in fault, for placing the salt in the hold, with so delicate a fabric as thread;

but, it being clearly proved, that salt in sacks is part of the mixed cargo of nearly all the vessels engaged in the trade between Liverpool and Charleston, and to other ports of the United States, it was held by the court, that the usage was decisive in favor of the ship-owners, and exonerated them from liability. This was the case of a common carrier, under the usual bill of lading, taking goods as a general ship. This decision by the supreme court of the United States, covers the whole ground of the present case.

I am of opinion, that the claim of the respondent cannot be sustained, and there must be a decree for the libellants.

See, also, Baxter v. Leland [Case No. 1,124].

[From this decree the respondent appealed to the circuit court. The case was heard in the circuit court upon motion by respondent to file amended answer. The motion was denied. Case No. 8,019.]