## The T. A. Goddard.

(District Court, S. D. New York. May 5, 1882.)

1. Charter-Party—Liability of Owner—Damage to Cargo.

    The owners of a chartered vessel, retaining control of her navigation, are liable for injuries to a part of the cargo occasioned by unaccustomed and dangerous goods subsequently taken aboard.

2. Same—General Ship—Cargo of—Liability for Taking Dangerous Goods.

    A general ship may carry such goods as are usually carried if due care is exercised in properly separating and stowing articles which might naturally injure each other; but the ship will be held to take at her peril goods known to be dangerous to merchandise previously shipped, or not usually carried in the same cargo.

3. Same—Bill of Lading—Recitals in, Binding as to External Condition.

    The scent of camphor in teas so strong as to be readily perceived in handling the packages is an *external mark* of their condition; and the recital in the bill of lading that such teas were "received in good order," is therefore *prima facie* evidence that they were not so scented when shipped aboard.

4. Carrier or Forwarder—As Bailee.

    A carrier or forwarder of goods as bailee is not the general agent of the owner; his possession is no *indicia* of ownership or of any general authority over the goods except such as is strictly incident to his duties as carrier, and third persons dealing with him do so at their peril. After delivery, pursuant to contract, to another carrier who has notice thereof, he has no authority subsequently to dispense with any of the conditions for safe transportation, and the shipper will not be bound thereby.

5. Charter-Party—Authority to Relet Vessel.

    Where a charter-party authorizes the charterer "to relet the vessel in whole or in part," the charterer is authorized to make subcontracts of affreightment and to sign bills of lading to shippers of goods from other ports which he may procure to be forwarded by other vessels to be transhipped upon the chartered vessel pursuant to the charter; and the ship will be bound thereby from the time they are received on board with knowledge of the facts. Such bill of lading is a reletting of the ship in part.

6. Same—Transhipment—Master Chargeable with Knowledge of Shippers' Rights.

    Where R. & Co. chartered the bark T. A. G. under such a charter-party for a voyage from Hong Kong to New York, and thereafter procured teas to be shipped by P. & Co. at Foochow on board the steamer O., to be carried to Hong Kong, and there transhipped on board the T. A. G., and thereafter carried to New York, for which a bill of lading was accordingly given at Foochow for the whole voyage, signed by R. & Co. and the master of the steamer upon terms in conformity with the charter-party, and the teas were afterwards duly transhipped on board the T. A. G. at Hong Kong, and the master gave a bill of lading therefor to R. & Co. which recited the amount of the freight as "through rate from Foochow," and the master thereafter took camphor aboard at the request of R. & Co., being dangerous goods and unaccustomed to be taken with teas, by which the teas were damaged during the voyage to New York, *held*, that the master was chargeable with knowledge of the shippers' rights and that the bark was liable *in rem* for the damage to the teas, and that the request of R. & Co. to take the camphor aboard was no defence.

7. SAME—BILL OF LADING—IRREGULAR IN FORM.

   The second bill of lading taken by R. & Co., though irregular in form, did not prejudice the rights of the shippers or of the libellants, their representatives.

8. SAME—CARRIER BY WATER—LIABILITY OF.

   A carrier by water is liable to the owner for the safe transportation of goods received on board, independent of any bill of lading; and the owner may proceed directly against the vessel or her owners, through whom the loss or injury occurs, though the latter have a contract with an intermediate party.

9. SAME—STIPULATIONS CONSTRUED.

   The stipulation of a charter-party that the vessel should " employ the charterers' stevedore," does not affect the liability of the ship or her owners where the master has the direction and control of the stevedore and the stowage.

This libel was filed to recover the amount of damages to 959 packages of tea on board the bark T. A. Goddard, alleged to have been injured by camphor on a voyage from Hong Kong to New York. The tea was shipped at Foochow, December 18, 1877, by Purdon & Co., on board the steamer Orestes, under a bill of lading which recited that the "teas were shipped at Foochow on board the steamer Orestes for transhipment at Hong Kong on the good vessel called the 'T. A. Goddard,' whereof Smith is master for this present voyage, now lying at Hong Kong and bound for New York; * * * to be delivered at New York to the order of Brown Bros. & Co. on payment of freight * * * at the rate of £1 15s. per ton of 40 cubic feet." This bill of lading was signed by the master of the Orestes, and also by Russell & Co., who thereby contracted for the delivery of the goods at New York.

Russell & Co. had, prior to this shipment, on November 20, 1877, obtained a charter-party from the owners of the T. A. Goddard, then lying at Hong Kong, whereby they had chartered her for a voyage from Hong Kong to New York, for the carriage of merchandise, upon the conditions and exceptions in the usual bills of lading, whereby the owners agreed to keep her well manned and found, and to receive from the charterers at Hong Kong lawful merchandise not exceeding 1,000 tons of 40 cubic feet; cargo to be well stowed and dunnaged at the ship's expense, being brought along-side and taken from the ship's tackles at the charterer's risk and expense; all pilotage, port dues, and charges to be borne by the vessel; the captain to employ the charterer's stevedore, paying him at the rate of 12 cents per ton; and the vessel not to receive on board any merchandise unless by the order of the charterers, who had the option of reletting the vessel in whole or in part; the ship to sail whenever the charterers should so instruct the captain—the charterers agreeing to pay for

the hire of the vessel at the rate of £1 7s. 6d. per ton of 40 cubic feet measurement, on delivery of cargo according to the bills of lading, which were to be signed by the captain, as presented, at any rate of freight without prejudice to the charter-party; the captain to have absolute lien on the cargo for freight, dead freight, or demurrage.

The evidence showed that Hong Kong is seven days distant by steamer from Foochow; that the teas were transhipped "direct" at Hong Kong upon the T. A. Goddard, for which another bill of lading was given on December 28, 1877, by the master of the latter, reciting that the goods were "shipped in good order and well conditioned by Russell & Co. on board the T. A. Goddard, lying at Hong Kong, and bound for New York, deliverable there to the order of A. A. Low & Bros., or their assigns, on payment of freight at the rate of £1 15s. per ton of 40 feet." On this bill of lading were stated in the margin the same marks and numbers as in the previous bill, and the measurement was extended, showing "£117 0s. 7d., *through rate from Foochow.*"

The bark sailed from Hong Kong on January 3, 1878, and arrived at New York in April, when the teas, on unloading, were found to be impregnated with the odor of camphor. They were stowed in the after-part of the bark, between-decks, beneath the poop, which was built upon the upper deck, in which a quantity of camphor was stowed.

The claimants contended that it was customary and lawful for a general ship to carry camphor in the poop, although teas were aboard the ship, and that all diligence was used in tightly caulking the hatch from the poop below, and all other air openings, so as to prevent the possibility of any fumes from the camphor reaching and injuring the teas. They also gave evidence to show that Russell & Co. had requested the master to take the camphor aboard after the teas had been laden, and claimed that the injury to the teas could not have occurred on board the bark, and that if it did the vessel was not liable.

*Benedict, Taft & Benedict,* for libellants.

*Owen & Gray,* for claimants.

BROWN, D. J. From all the evidence in the case I am satisfied that the injury to the teas from the fumes of the camphor must have arisen on board the T. A. Goddard. They are proved to have been in good condition when shipped on board the Orestes at Foochow, and that vessel had no camphor aboard. The teas were transferred "direct" to the T. A. Goodard at Hong Kong, which took

a quantity of camphor aboard in the poop immediately over where the teas were stowed. The teas were unloaded on the day of the arrival of the bark at New York, or on the day following, and were then found to be so scented with camphor that the odor was perceptible as they were taken upon the truck along the street. Had this strong scent not been caused on board the bark, it must have been less perceptible on arrival here than when shipped at Hong Kong. At New York this odor was such as to constitute a manifest external condition; and if it existed when shipped at Hong Kong, it must have been as noticeable there as here, and in fact more so; and teas so scented were not "in good order and condition," within the terms of the bill of lading signed at Hong Kong by the master of the bark. These recitals in the bill of lading are *prima facie* evidence against the vessel as to all matters affecting the external condition of the cargo, (*The Ship Martha Olcott*, 140; *Clark* v. *Barnwell*, 12 How. 272, 283; *Bradstreet* v. *Heran*, 2 Blatchf. 116; *The Bark Olbers*, 3 Ben. 148;) and upon the bill of lading, therefore, as well as upon the proved absence of any other previous cause, the injury must be held to have occurred during the voyage from Hong Kong. See *The Lizzie W. Virden*, 12 Rep. 552; S. C. 11 Fed. Rep. 903.

The evidence produced by the claimants to show that it was customary, or not regarded as dangerous, to bring camphor in the same vessel with teas seems to me insufficient. On the contrary, several of the oldest merchants testified that it was not customary; that it was known to be dangerous; and some regarded it as a thing unheard of. The master testified that he had never brought camphor with tea before; that he hesitated about taking the camphor in the present case; that he made inquiries about it of other captains, and was told by some that it might be taken in the poop of a vessel like the T. A. Goddard, and that he thereupon took it aboard as requested by Russell & Co.

A general ship may carry such goods as are usually carried in the same cargo without liability, if due care is exercised in properly separating and stowing articles which might naturally injure each other. *Clark* v. *Barnwell*, 12 How. 272; *Baxter* v. *Leland*, 1 Blatchf. 526; *The Sabioncello*, 7 Ben. 360; *Lamb* v. *Parkman*, 1 Spr. 343. But where articles are received on board known to be dangerous to goods previously shipped, and not usually carried in the same cargo, the ship must be held to take them at her peril; nor does any reason appear in this case why the teas should not have been placed in a

v.12,no.2—12

part of the ship more remote from the camphor. The vessel should therefore be held liable, as well for negligence in receiving camphor aboard as for improper stowage, unless the libellants are precluded from recovery because bound, as is claimed, by the acts of Russell & Co., and by their consent to the receipt of the camphor on board.

The charter-party in this case constituted a contract of affreightment only, and not a demise of the vessel to the charterers for the voyage. *Marcardier* v. *Chesapeake Ins. Co.* 8 Cranch, 49, 50; *Donahoe* v. *Kettell*, 1 Cliff. 135; *Richardson* v. *Winsor*, 3 Cliff. 395, 400; *Drinkwater* v. *The Spartan*, 1 Ware, 153, 156; *Leary* v. *U. S.* 14 Wall. 607; *Reed* v. *U. S.* 11 Wall. 600. The owners of the bark, retaining the possession and control of her, were, therefore, as carriers, responsible for her navigation, and for due care and diligence in the custody, stowage, and transportation of the goods, according to the terms of the charter-party and the usages of trade; and the vessel became liable *in rem* for any breach of those obligations. *The Gold Hunter*, Bl. & H. 300; *The Rebecca*, 1 Ware, 188; *The Phebe*, Id. 265; *The Paragon*, Id. 322; *Gracie* v. *Palmer*, 8 Wheat. 605, 633; *Freeman* v. *Buckingham*, 18 How. 182, 190; *N. J. St. Nav. Co.* v. *Merchants' Bank*, 6 How. 344, 381; *Propeller Niagara* v. *Cordes*, 21 How. 7, 22, 23; *Lamb* v. *Parkman*, 1 Spr. 343; Maclac. Shipp. 115, 390.

It is contended on the part of the claimants, however, that the libellants are bound by the acts of Russell & Co., even subsequent to the shipment of the teas on board the T. A. Goddard, and that they are precluded from any recovery in this case because Russell & Co. requested the master of the T. A. Goddard to take the camphor on board, and that this estops the libellants from any claim for damages resulting therefrom, as much as if they themselves had requested it. (Maclac. Shipp. 415;) that the bill of lading signed by the master of the T. A. Goddard describes Russell & Co. as the shippers of the teas at Hong Kong, and this is referred to as evidence that the bark dealt with Russell & Co. alone, and had no knowledge of any other persons being interested in the teas; and that, for the purposes of this shipment, Russell & Co., who had been entrusted with the goods at Foochow, must be deemed to be the agents of the owners in shipping them on board the T. A. Goddard, and authorized by them to permit the carriage of the camphor as part of the cargo.

The liability of a vessel *in rem* for want of due diligence in the care and custody of goods received on board for transportation is the same whether the owners of the ship remain in possession as carriers, or whether the terms of the charter-party are such as to constitute a

demise of the vessel for the voyage, so as to render the charterers the owners *pro hac vice*, and alone personally responsible for the transportation. If the charter-party had in this case, therefore, transferred the entire possession of the ship to Russell & Co., and the damage from camphor had arisen through their own sole act, the ship must have been held answerable to the libellants, (*Schooner Freeman* v. *Buckingham*, 18 How. 182, 189; *The Phebe*, 1 Ware, 263, 271; *Richardson* v. *Winsor*, 3 Cliff. 406,) and the owners of the bark must have looked to Russell & Co. for their indemnity. *Pierce* v. *Winsor*, 2 Cliff. 18; *Gillespy* v. *Thompson*, 2 Jur. (N. S.) 713; Maclac. Shipp. 445, 446. There would seem to be no reason, therefore, why the ship should be any the less liable where, as in this case, the damage arose through the concurrent acts of the charterers and the master, and where, by the terms of the charter-party, the owners remained in possession of the ship, and through their agent the master held control of her, and had the right to reject improper or dangerous goods, even though requested to take them by Russell & Co., but failed to do so. *Brass* v. *Maitland*, 6 El. & Bl. 470; *Pierce* v. *Winsor*, 2 Cliff. 18; Abb. Shipp. †402.

Aside from this consideration, however, the evidence fails to show that Russell & Co. were the general agents of the owners of the teas, or that they had any authority whatever, or any apparent authority, to dispense with the observance of any of the customary precautions for the safe carriage of the goods. Russell & Co. had signed a bill of lading upon the shipment of the teas at Foochow, and had thereby bound themselves individually for the entire transportation according to the terms of that bill of lading; first by the Orestes to Hong Kong, and thence by transhipment on board the T. A. Goddard for the rest of the voyage to New York. At the time of signing this bill of lading they held a charter-party which fully authorized them to make such contracts for transportation upon the T. A. Goddard. Under this charter-party they were expressly authorized "to relet the vessel in whole or in part." That authority to relet embraced by necessary implication an authority to bind the captain and owners of the bark, subject to the terms of the charter-party, to the performance of all the ordinary duties of carriers by water as regards any goods which Russell & Co. might procure to be shipped on board. A bill of lading is, in one respect, but a particular contract of affreightment for so much space in the vessel as the particular goods require. *Drinkwater* v. *The Spartan*, 1 Ware, 156. In procuring Purdon & Co., whom the libellants represent, to part with their goods

at Foochow and ship them on board the Orestes under the bill of lading there given to them and signed by Russell & Co. for the whole voyage to New York, the latter by that act relet and pledged to the libellants so much of the T. A. Goddard as was required for the carriage of their goods, with all the securities for safe carriage which the charter-party afforded. This was precisely such an act as the charter-party expressly authorized Russell & Co. to do. The bark was interested in and benefited by its performance through the freight to be earned thereby, on which she would acquire a lien as security for her own compensation. The libellants, or their representatives, in receiving the bill of lading signed by Russell & Co., and in parting with their goods and shipping them on board of the Orestes on the faith thereof, had a right to rely upon the performance of that which the bark had thus authorized Russell & Co. to pledge, viz., the transportation of the goods to New York upon the ordinary obligation of carriers by water, such as existed under the express terms of this charter-party. Its provisions from that moment enured to the benefit of the libellants, the goods being lawful and accustomed merchandise, such as the bark was bound to receive.

The charter-party, with its authority to Russell & Co. to relet, and the subsequent bill of lading signed by Russell & Co. pledging transportation upon the bark in accordance with the terms of the charter-party, made together a valid contract for the carriage of the teas, which neither Russell & Co. nor the bark could thereafter vary, and which, from the moment the goods were received on board of the bark with notice of the sub-contract, bound the bark, as well as her owners, to its performance. Thereafter the terms and obligations of the contract were unalterable, except with the consent of the shippers. Neither Russell & Co. nor the captain of the bark had any more authority to dispense with the usual precautions for the safe transportation of the teas, than they had to carry them on deck or to throw them overboard.

In the case of *Gracie* v. *Palmer*, 8 Wheat. 605, 639, it was held not to be within the power of the master and the charterers combined to make any arrangement with the shippers, who had means of knowledge of the charter, whereby the ship-owners would be deprived of their lien upon the goods for freight according to the terms of the charter-party, on the ground that the master had no authority to make any such changes in the terms of the owner's contract; and this was also approved in *Freeman* v. *Buckingham*, 18 How. 182, 192. See, also, *Pollard* v. *Vinton*, U. S. Sup. Ct. April, 1882, (13 Rep.

545; Mar. Reg. May 10, 1882.) The same principle applies conversely to the owners of the goods. Russell & Co., the charterers, had no authority to vary the contract which they had made with the shippers of the teas, and neither they nor the master, nor both combined, could, after the shipment of the goods on board the bark, with notice of the shippers' contract, vary the carrier's obligation, or deprive the shippers of their lien on the ship for safe and careful transportation.

The libellants, having no direct agreement with the master of the T. A. Goddard, are doubtless limited in their recovery by the lawful terms of the contract between Russell & Co. and the bark, as laid down in the case of the *N. J. St. Nav. Co.* v. *Merchants' Bank*, 6 How. 344. But this contract is to be found in the terms of the charter-party executed between Russell & Co. and the ship-owners prior to the shipment of the teas, in precise accordance with which the libellants' goods were shipped, first, on board of the Orestes, and thence by transhipment, on board of the bark, and not in any subsequent arrangements in violation of those agreements.

The rights of the libellants must be determined according to the terms of the contract between the bark and Russell & Co., as it existed at the time the libellants acted upon it by shipping their goods under the bill of lading given by Russell & Co., and not by any subsequent contract or parol requests at variance with the terms under which the goods had already been received on board of the T. A. Goddard.

The lading on board of the bark by transfer from the Orestes was, in legal effect, as much the act of the libellants, or their representatives, as if they had been shipped by them directly on board of the bark in the first instance; and Russell & Co. had no more authority, after the goods had been thus shipped, to dispense with precautions necessary to their safety than in the case of any other shipper.

The captain of the bark in this case had sufficient notice that these teas were not the goods of Russell & Co. and cannot claim exemption on the ground that he dealt with Russell & Co., as the owners of the goods, authorized at any time after the shipment to dispense with the usual conditions of liability. There was nothing in the situation, upon the transhipment of the teas from the one vessel to the other, from which the master of the bark had any right to assume that the teas were the property of Russell & Co., or that they had any authority to waive any necessary precautions to insure their safety. Russell & Co. had not been furnished by the shippers with any *indicia* of

ownership, or of the right of disposal of the teas. It does not appear by the evidence in what relation Russell & Co. stood to the 'Orestes; but if they had any possession or custody of the goods at all, it was at most only in the character of bailees for their transportation, precisely like that of the master of the Orestes while they were on board that vessel, viz., that of a carrier of merchandise, subject to and limited by the terms of the bill of lading which they had signed. But such possession by a carrier of goods is not even *prima facie* evidence of any ownership, or of any general authority over the goods, except such as is strictly incident to and limited by his duties as carrier; and third persons dealing with him in reference to the goods do so at their peril. *Saltus* v. *Everett*, 20 Wend. 267, 284; *The Idaho*, 93 U. S. 576, 583; *McNeil* v. *Tenth Nat. Bank*, 46 N. Y. 325, 329, 330; *Covill* v. *Hill*, 4 Den. 523; *Moore* v. *Met. Nat. Bank*, 55 N. Y. 41; *Gracie* v. *Palmer*, 8 Wheat. 639.

The captain of the bark knew that her carrying capacity was by the terms of the charter-party at the disposal of Russell & Co.; that they were expressly authorized to "relet the vessel in whole or in part;" that she had been advertised by them to the public as a general ship for the carriage of merchandise; and he knew, therefore, that other persons were interested in the character of the goods received aboard. The bill of lading of the Orestes, from which the teas were transhipped direct, must have been easily accessible to the master of the bark, and showed that Russell & Co. were not the owners of them; as, in the case of *Gracie* v. *Palmer*, *supra*, the terms of the charter-party were held accessible to the shippers. The bill of lading, signed by the master himself at Hong Kong, showed on its face that the teas had been brought from Foochow on *freight*; it recited the amount of this freight at a rate about 25 per cent. greater than the rate of the charter-party; and it expressly stated it to be "through rate from Foochow," *i. e.*, through to New York.

These facts would seem sufficient of themselves to apprise the captain of the bark that the teas could not have been the goods of Russell & Co. They were certainly sufficient to put him upon his guard, and upon inquiry, which would easily have led to knowledge of the facts; and I cannot doubt that the facts were fully known to him; for, though twice examined upon separate depositions, he does not in either deposition state that the teas were ever represented to him to be the teas of Russell & Co.; that he supposed they were their goods; or that, in subsequently receiving the camphor aboard, he relied upon their request as exempting the ship from liability. On

the contrary, the master did not accede to this request at once, but only after some delay, and after inquiry of other masters of vessels as to the danger of carrying camphor; so that he seems to have acted upon his own judgment, and upon his own sense of responsibility to the owners of the goods on board, whoever they might be, and not upon any supposed exemption from liability through the request of Russell & Co., or any belief that they were the owners of the teas.

If the bill of lading signed by the master of the bark at Hong Kong, describing Russell & Co. as shippers, and naming new consignees of the teas, were to be interpreted as a contract whereby the goods were designed to be shipped by Russell & Co., as absolute owners, to independent consignees, it would import a conversion of the goods by Russell & Co., since they had no authority from the owners, nor any semblance of any authority, for such an act; and as the master of the ship had sufficient means of knowledge as to the facts, this wrongful act of Russell & Co. would furnish no defence to the ship.

There is no reason, however, to place this interpretation upon the bill of lading taken in the name of Russell & Co. and signed by the master at Hong Kong, because the evidence shows there was no intention or understanding by either party looking to any diversion of the goods. The teas, on arrival at New York, were delivered according to the terms of the bill of lading given at Foochow, to the order of the consignees named therein, upon the payment of the freight, to the consignees of the ship; and the second bill of lading signed at Hong Kong, would seem, therefore, to have been designed only as a memorandum of the receipt of the teas on board, given to Russell & Co. as representatives of the real owners, and also as a means of transferring to the agents of the ship at New York the whole through freight from Foochow, on account of the freight due under the charter-party. The consignees named in it never pretended to any right in the teas beyond the amount of this through freight, and it was, doubtless, so understood by both.

While, therefore, the second bill of lading was irregular in form, it does not appear to have been designed, as it certainly was not used, to prejudice the rights of any of the parties. Nor was it essential to the rights of either. The rights of Russell & Co. were protected by the terms of the charter-party, and those of the libellants, by the first bill of lading signed by Russell & Co., which bound the bark from the time the teas were received aboard with notice of it. In signing bills of lading in such cases, the master, according to the late English authorities, acts as agent of the charterer; although the owners will

also be held liable where a shipper has dealt with the master in ignorance of the charter. *Marquand* v. *Banner*, 6 El. & Bl. 232; *Sandeman* v. *Scurr*, L. R. 2 Q. B. 86, 97; *Schuster* v. *McKeller*, 7 El. & Bl. 704, 723; *The St. Cloud*, 1 Brow. & Lush. 4, 15. See *Peek* v. *Larsen*, L. R. 12 Eq. Cas. 378. But in this country it has been repeatedly held that the obligations of a carrier by water to use due care and diligence in the stowage and transportation of the goods received on board exist independently of any bill of lading. *Brower* v. *The Water Witch*, 1 Black, 494, Nelson, J.; *Robinson* v. *Crittenden*, 69 N. Y. 525, 531; *The Casco*, 2 Ware, 184, 186; *The D. R. Martin*, 11 Blatchf. 235. And it is well settled also that a person whose goods are transported by contract with a charterer, in a chartered vessel navigated by her owners, as in this case, is not limited, in case of loss or injury to his goods, to his remedy against the charterer on the express contract with him, but may directly pursue the vessel or her owners who have caused the loss. *N. J. St. Nav. Co.* v. *Merchants' Bank*, 6 How. 344, 380; *Freeman* v. *Buckingham, supra; Campbell* v. *Perkins*, 4 Seld. 430, 438; *The D. R. Martin, supra*.

The provision of the charter party that the captain should "employ the charterer's stevedore, paying him at the rate of 12 cents per ton," does not affect the liability of the ship or her owners for improper stowage, since the stevedore in such cases is held to be in the employ of the captain, and under his direction and control, as the representative of the owners, (*Richardson* v. *Winsor*, 3 Cliff. 405-7; *Sandeman* v. *Scurr*, L. R. 2 Q. B. 86, 98;) although it is otherwise where the stevedore acts under the direction of the shipper or owner of the goods. *The Diadem*, 4 Ben. 247; *The Miletus*, 5 Blatchf. 335; *Blaikie* v. *Stembridge*, 6 Com. B. (N. S.) 894, 915. See the last case explained by *Clifford*, J., in *Richardson* v. *Winsor*, 3 Cliff. 404. Except in the application of its special facts, *Blaikie* v. *Stembridge* must be deemed overruled by the case of *Sandeman* v. *Scurr, supra*.

No sufficient grounds, therefore, appearing to exempt the ship from liability, the libellants are entitled to judgment, and to an order of reference to compute the damages, with costs.