### THE HIRAM.

(District Court, S. D. Alabama.    April 21, 1900.)

No. 854.

1. SHIPPING—DAMAGE TO CARGO—DELAY IN PREPARING VESSEL FOR LOADING.
   A contract of affreightment becomes effective, so as to render the carrier liable for its breach, only from the time the goods are delivered for shipment; and the owner of a cargo has no lien upon a vessel for injury to such cargo resulting from delay in preparing the vessel for loading which occurred before the cargo was received by the owners or their agents.

2. SAME—CONTRACT OF AFFREIGHTMENT WITH CHARTERER—LIABILITY OF VESSEL FOR BREACH.
   Neither a vessel nor her owner is liable for a breach of a contract for the carriage of a cargo, between the charterer and a shipper, occurring before any part of the cargo had been put on board.

3. SAME.
   A ship is answerable for any negligence that causes damage to a cargo after it has been placed on board under a contract of affreightment between the shipper and a charterer, and a suit to enforce such liability may be maintained by the shipper directly against the vessel; but she cannot be held liable for damage resulting from delay due to the condition of the weather, and not to any negligence in her navigation.

4. SAME—CONSTRUCTION OF CHARTER.
   A vessel was described in a charter as a water-ballast ship, and was so accepted without objection by the charterer, who contracted to carry in her a cargo of cattle. The shipper desired to load a number of the cattle on the deck, which was refused by the master on the ground that it would be unsafe, with the ballast the ship carried. Held, that he could not be required to provide additional ballast, nor could the ship be held liable for his refusal to load the cattle as required by the shipper; it being shown that his objections were well founded, and there being no provision of the charter specifically requiring the vessel to take a deck cargo, or to carry any specific number of cattle.

In Admiralty.    Suit to recover damages for injury to cargo.

Gregory L. & H. T. Smith, for libelant.
Pillans, Hanaw & Pillans, for claimant.

TOULMIN, District Judge.    There is no claim in this case that the vessel was unseaworthy at the time she sailed with the cargo

on board, or that the damage complained of was caused from the unseaworthiness of the vessel during the voyage; and it appears that she was not unseaworthy when taking the cargo aboard, but that she was discovered to be so while being prepared to receive the cargo. On the discovery of a leak in the water tank, she was considered unseaworthy, and the master stopped the work of prep- aration for cargo, and proceeded at once to repair the tank. The contention of libelant is that by reason of certain delays in taking the cargo aboard, and in proceeding on the voyage after it was laden, the damage complained of arose. The delays specified, and that, it is urged, mainly caused said damage, were by reason of the negligence of the master of the vessel in not repairing the tank sooner, and of his further negligence in not having his winches in proper order. These delays were during the time the cargo was not in the possession of the vessel, nor had it been delivered to it or to its owners or agents. No law relating to the liability of common carriers justifies a rule that they are liable for injury to goods not in their possession, arising from delay in conveying them, and not delivered to them during such delay. The George Dumois (D. C.) 88 Fed. 543. "The owner of a cargo has no lien upon the vessel for the breach of a contract of affreightment until the cargo, or some portion, has been laden on board or delivered to the master." Scott v. The Ira Chaffee (D. C.) 2 Fed. 401, and authorities therein cited. The liability of a common carrier usually begins when the goods are delivered to him at the place appointed or provided for their reception, in a proper condition, and ready for immediate trans- portation. Independently of any special agreement, he is account- able for any damage or loss that may happen to the cargo in its con- veyance, unless arising from inevitable accident,—in other words, the act of God or the public enemy. New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. 344, 12 L. Ed. 465. I do not find from the evidence that the master was negligent in either particular re- ferred to. These delays are not shown to have been caused by his negligence, nor are they shown to have been voluntary, in the sense that they were unjustifiable. The evidence shows that the tank had been thoroughly overhauled and repaired but a few months before, which, in view of the expert testimony as to custom and necessity for more frequent inspection and repair, and as to the condition of the tank at the time of the aforesaid repairs, satisfies me that the master was guilty of no negligence in the premises. As soon as he discovered the leak in the tank, he proceeded at once to repair it, as it was his duty to do, to render the vessel seaworthy for the voy- age on which she was about to enter. The evidence also shows that the winches were in good order, but that there was no steam up, ready to operate them; that the master had not been positively notified that they would be needed. As soon as he was so notified, steam was promptly raised, and the winches were at work. How- ever, the delay on this account was inconsiderable, and it appeared that it did not materially interfere with the loading of the cargo.

There is a case in 17 Fed. (the case of The J. C. Stevenson [D. C.]

17 Fed. 540) where a libel was filed to recover damages for the loss of cattle shipped by libelant on said steamship, and for damages resulting from the delay of the steamship entering upon the voyage. The contract for the shipment of the cattle was made by the agent of the steamship, and provided for her to sail with the cattle on the 12th of October, or thereabouts. She did not sail until about the 14th of November, owing to her nonarrival at the port of departure until the 4th of November. There was a delay of about a month. Damages were claimed for this delay. The court, in its opinion, says the damages on this ground cannot be extended beyond such as had occurred up to the time the cattle were put on board; that as the ship, when she did arrive, was accepted by the libelant, and did in part perform the contract, by her taking the cattle with his consent, he can recover the cost of keeping the cattle during the delay, and this is all he can recover; adding that it is a question not free from doubt whether for these items for damages the libelant has a lien on the ship. The court cites but one authority to sustain its decision, and that case was in personam. The case of Hoadley v. The Lizzie (C. C.) 39 Fed. 45, cited by libelant on the point of delay in loading and prosecuting the voyage, was a libel for damages for breach of a charter party, brought by the charterers. The court held that a careful examination of the pleadings and evidence in the case showed that the delays on the part of the vessel in the execution of the contract were wanton and wholly inexcusable, and, wholly unexplained as they were, fully justified the suit and the recovery of resulting damages. The charter party in the case stipulated that the vessel should be at the port of loading by a day named, "excepting the acts of God in weather * * * preventing," and also stipulated that there should be "quick dispatch in loading as fast as the vessel could receive." The delays complained of were in loading, and in prosecuting the voyage after she was loaded. I find the preponderance of authorities to be that "any duty that may be violated by the owner or master before the cargo is put aboard the vessel is not a duty of the vessel, or one for the breach of which a lien on the vessel is created or can be enforced." Scott v. The Ira Chaffee, supra, and numerous authorities therein cited. The case of The Lizzie, supra, is unlike the present one in its facts. In this case the libelant had no direct agreement with the owners or master of the vessel for the carriage of the cargo, and there was no assignment of the charter to him, but the agreement was a contract of affreightment made with the original charterer, who undertook to transport the cargo. My opinion is that for a breach of this contract there can be no liability on the vessel or its owners. The ship, however, would be answerable for any negligence that caused damage to the cargo after its shipment on board; that is to say, it would be answerable to the shipper upon the implied contract to transport safely, and that there should be no unreasonable delay in commencing and prosecuting the voyage after the cargo had been received by the vessel. 1 Pritch. Adm. Dig. p. 492, § 223; The T. A. Goddard (D. C.) 12 Fed. 174; The Euripides (D. C.) 52 Fed. 161. And

"a person whose goods are transported by contract with a charterer, in a chartered vessel, navigated by her owners, is not limited, in case of loss or injury to his goods, to his remedy against the charterer on the express contract with him, but may directly pursue the vessel or her owners, who have caused the loss." The T. A. Goddard, supra; New Jersey Steam-Nav. Co. v. Merchants' Bank, supra. But I am clearly of the opinion that the vessel is not liable for any loss or damage that was caused by the delays complained of as occurring prior to the delivery of the cargo to the vessel. The libelant, however, alleges that the master was negligent in not proceeding to sea promptly when the cargo was laden, and by which he claims he was damaged by the loss of some of his cattle, and the deterioration in value of the remainder of them, due to their long confinement on board of the vessel. There was delay in proceeding on the voyage after the cargo was on board, and also after the vessel broke ground. But the evidence tends to show that these delays were not unreasonable, in view of the existing circumstances and conditions; that on the day the loading of the cattle was completed, and at the time it was completed, a heavy fog had arisen, which prevented the vessel from sailing; that the master made efforts to get a bar pilot to take the vessel down the channel to the bay, but failed to get one, owing to the condition of the weather, and the hazards of navigating the channel in it. The evidence tends to show that navigation of the lower river and channel was prevented or at least suspended for two or three days; that after the vessel had sailed, and while going down the channel, she had to stop and cast anchor, owing to the fog; that further down the channel she got aground; that this was due mainly to the obstruction of the channel by a vessel lying therein, but that her delay there was due to fog which rendered navigation of the channel at that point impracticable. In short, the effect of the evidence was, in my opinion, that the several delays in prosecuting the voyage after the cargo was laden were due, not to the negligence of the master, as alleged, but to the condition of the weather and consequent interruption of navigation. For these delays the vessel is not answerable.

Another cause of damage alleged in the libel is the master's refusal to allow 70 head of cattle to be shipped on the deck of the vessel, which the libelant desired and offered to so ship. The master stated that the reason for his refusal to take the cattle on deck was that the vessel was "quite crank and tender," and already lurched and rolled considerably, and that, in his judgment, he could not reasonably or safely carry such deck load with the ballast that he had; that to have done so would have rendered the vessel unseaworthy and unfit for the contemplated voyage. And such was substantially the expert evidence on the subject. It is, however, urged on the part of the libelant that if the vessel, with the ballast she had, was unseaworthy and unfit for the voyage with the proposed deck load of cattle, it was the master's duty to have provided additional and sufficient ballast. I do not think this contention sound. The vessel was a water-ballast ship. She was so described in the charter,

and hence known as such to the charterer, and accepted by him without any provision for extra ballast, and presumably so known to the libelant,—at all events, was delivered to the libelant as a water-ballast ship. The charterer presumably considered that the vessel had sufficient ballast for the service and purpose for which he had chartered her. He required no additional ballast. His contract with libelant did not provide specifically for a deck cargo, or for a specific number of cattle to be transported. I think, under the circumstances, that it was the duty of the libelant or the charterer to have furnished the extra ballast, if it was necessary to enable the vessel to carry the deck cargo desired.

The case of The Alvah (D. C.) 59 Fed. 630, cited by the libelant, was an action against the ship to recover damages for a violation of a contract of affreightment. The contract, made by the ship's brokers, and confirmed by those who had authority to bind the ship, stipulated for the transportation of 374 head of cattle. Only 332 head of the cattle were shipped, and the court held that the shipper was entitled to recover for the failure of the ship to transport the additional 42 head called for by the contract. The ship's brokers stated that the 374 head of cattle, if carried in the space allotted by the ship for their transportation, could be insured. It turned out that insurance could not be effected upon so many cattle placed in the space allotted for them, without additional ventilation, which the master refused to provide; and the shipper thereupon refused to ship more than 332 head of his cattle, and sued to recover damages for the nonshipment of the 42 head. The court held, in substance, that, in a contract for transportation of cattle, it is implied that the space allotted to the cattle for the voyage shall be sufficiently ventilated, and the ship's brokers having reported that the ship would insure, and it turned out that insurance could not be effected on the number of cattle contracted to be transported, without additional ventilation, and the master refusing to provide sufficient ventilation for the space allotted to the cattle, the shipper was justified in refusing to ship more cattle than could be safely transported in the space allotted without further ventilation, and that the ship was liable for the damages sustained by the shipper by reason of the nonshipment of the excess. The damages were not found, and the rule on which they were to be ascertained was not stated in the opinion. It seems to me that the principle involved in this decision is that of liability of a vessel for improper stowage of cargo, or refusal to properly stow. A specified cargo, in character and quantity, was contracted for. A part of it was received aboard the vessel. The performance of the contract was actually entered upon by the vessel, and after the performance of the contract had begun, and the ship became bound to its full performance, it, in effect, refused to fully perform it, and thereby rendered itself liable for a violation of the contract. This case was reversed, on appeal, by the circuit court of appeals. It was, however, reversed on the ground that there was not satisfactory proof of a breach of the contract. The Alvah, 23 C. C. A. 181, 77 Fed. 315. The case of

The Alvah does not seem to me to be a parallel case to the one at bar. In that case there was a contract with the ship for the transportation of a specified number of cattle, a part of which was shipped; the remainder not shipped, as was claimed, by a fault of the master, and which the court held, if true, was a violation of the ship's contract, and for which the ship would be liable.

The libelant was unfortunate in his adventure, and, no doubt, sustained loss in it; but, as I understand the law and the pleadings and evidence in this case, the vessel is not responsible for such loss. The libel is therefore dismissed.