## The J. C. Stevenson, now the Stanmore.

*(District Court, D. Maryland. June 20, 1883.)*

1. SHIPPING—LOSS OF CARGO OF CATTLE—STORM AT SEA—BURDEN OF PROOF—SUITABLENESS OF VESSEL.

   Where respondents prove that a steam-ship, on which a lot of cattle were shipped by the libelant, encountered a storm of unusual severity, and show the character of the damage sustained by their vessel and by other steam-ships carrying cattle which encountered the same hurricane; the burden is put upon the libelant of proving that the losses sued for were occasioned by the want of due care in providing a proper ship, and suitable stalls and other fittings, for carrying the cattle.

2. SAME—EVIDENCE.

   Upon the whole testimony, considering the contrivances then in use for carrying cattle, and the known risks and uncertainties of the business, and the character of vessels customarily used, it does not appear that the steam-ship in this case would have been considered unsuitable for the business at the time she was so used, or that the fittings were improperly constructed, and no damage can be recovered on that account.

3. SAME—DELAY IN COMING TO PORT FOR CARGO—DAMAGES.

   Where a vessel is to arrive at a port and receive a cargo of cattle by a certain day specified, and she does not arrive for several weeks after the appointed time, the only damages that can be recovered on account of the delay, when the vessel is accepted and the cattle shipped, is such expense as may have been incurred for keeping the cattle during the period of delay, and the additional insurance the shipper may have had to pay by reason of the increased risk caused thereby.

4. SAME—DAMAGES A LIEN ON VESSEL.

   Where the cattle were actually laden on board under the contract, and reference being specially made to it in the libel, and the ship has obtained the benefit of the contract, it seems that the shipper would have a lien on the vessel for such damages.

In Admiralty.

*Marshall & Hall*, for libelants.

*Brown & Brune*, for respondent.

MORRIS, J. This libel is filed to recover damages for the loss of a large number of cattle shipped by libelant on the steam-ship J. C. Stevenson, on November 13, 1879, to be carried to London, which were lost on the voyage, and for damages resulting from the delay of the steam-ship in arriving at the port of Baltimore to enter upon the voyage. The contract for the shipment of the cattle was as follows:

September 22, 1879, Mr. Francis Bell, hereinafter called the shipper, hereby agrees to ship in the steam-ship J. C. Stevenson, to sail from Baltimore for London on the twelfth day of October or thereabouts, seven days' notice having been previously given by the agents of the steam-ship to the shipper, 380 cattle, subject to the following conditions:

(1) The steam-ship is to carry the cattle stowed on her decks; (2) the steam-ship is to provide stalls or pens for the cattle constructed upon the plan of those hitherto adopted, or such new plan as may be mutually approved; (3) the between-decks are to be satisfactorily ventilated; (4) a supply of fresh, cool water, equal to a maximum of eight gallons per head *per diem* is to be supplied by the steam-ship; (5) the steam-ship is to provide free steerage passages to and from London to one attendant upon every 25 cattle, if required, and cabin passages to the foreman in charge; (6) the shipper is to provide feed, and all necessaries and utensils, such as buckets, pitchforks, ropes, etc.; (7) the ship is to carry all the feed that the animals consume on the passage freight free; (8) the shipper is to rope the animals before or after they are put on board; (9) the freight is payable upon said cattle, for transportation from Baltimore to Deptford, at the rate of three pounds ten shillings per head each, at Baltimore or Deptford, at shipper's option, but is to be collected upon the number shipped at Baltimore; (10) the steam-ship is warranted by the shipper free from responsibility for mortality or accident of any kind; and if any of them die, or are thrown overboard, or are washed overboard, or are lost in any manner whatsoever, the freight is nevertheless to be paid.

If the shipper desires that freight should be paid at Deptford he must, if required, deposit insurance policy with agent of vessel assigned to him, or, if insured in England, assign lien or policy to the amount that "may be incurred."

The bill of lading, dated November 13, 1879, contains all customary exceptions, and states the rate of freight to be £3 10s., "*and all other conditions as per contract dated September 22, 1879.*"

In the margin of the bill of lading is written: "Not responsible for mortality, nor for any accident of any nature or kind whatever; and if any of them die, or are thrown overboard, or are washed overboard, or are lost in any manner whatsoever, freight is nevertheless to be paid on them on arrival of vessel at London." When the ship arrived in the port of London, after a long and tempestuous voyage, of the 380 head of cattle all had been lost but 21.

The respondents having shown that the steam-ship encountered a storm of unusual severity, and having proved the character of the damage sustained by this and by other steam-ships carrying cattle which encountered the same hurricane, have shown enough, in my judgment, to put upon libelant the burden of proving that the losses sued for were occasioned by the want of due care in providing a proper ship, and suitable stalls and other fittings, for carrying the cattle. In judging of what was reasonable in this respect, we are to put ourselves in the situation of these parties who were contracting with respect to carrying cattle across the Atlantic in November, 1879. It was then a new and experimental venture, and the improved appliances now used in the business are greatly the result of the experience then being obtained. The original contract between the agents of the steam-ship and the libelant contained the following provisions with regard to the fittings for the cattle:

"The steam-ship is to provide stalls or pens for the cattle constructed upon the plan of those hitherto adopted, or such new plan as may be mutually approved."

It is shown that the stalls on this voyage on which the loss occurred were the same which had been put upon the steam-ship at Montreal and used on the previous voyage. On that voyage she had successfully carried 350 head of cattle and 400 sheep from Montreal to England, not losing a single head of cattle, and but a few of the sheep. Immediately after the voyage to England, on which she carried these cattle and sheep, the steam-ship came to Baltimore, bringing as cargo a small quantity of pig-iron. When the pig-iron was discharged, such of the stalls as had been taken down for that purpose were replaced, and all were put in repair by competent carpenters, experienced in putting up stalls for cattle on board ship. These fittings were then inspected and approved by a marine surveyor, who certified, after the cattle were on board, that the loading was completed properly, and the ship in good condition to proceed on her voyage. The stalls were seen by the libelant and his agents before and while the cattle were being put on board, and no complaint or suggestion was made with regard to them. When the ship arrived at the port of London the libelant paid the freight on all that were shipped, as had been agreed, and no complaint was ever made, or claim for damages, until the filing of this libel, 14 months afterwards. The respondents, in my judgment, have not only shown that the stalls and the ventilation were such as might reasonably have been expected to be sufficient, but have shown that they had been actually tested on the previous voyage and found sufficient.

It was urged on behalf of the libelant that the fact that 15 of the cattle between-decks died before there was any rough weather, and while the hatches were open, is conclusive that the ventilation could not have been sufficient. But it is shown that on the previous voyage 200 cattle were carried between-decks and not one died, although the weather experienced on that voyage required the hatches to be closed. In the face of this, it seems to me that it must be held that the owners of the steam-ship had every reason to believe that the ventilation was sufficient; and, indeed, it would appear that these 15 cattle must have died from some other cause than suffocation. As to the severity of the weather which the steam-ship encountered, and how long the cattle-stalls endured the violence of the storm before they were destroyed, I think that, probably, the most trustworthy testimony, after so long a lapse of time, is to be had from the ship's log. It contains these entries:

*Tuesday, November* 18, 1879. Towards midnight, fresh gale blowing, with heavy squalls and rain. Hands employed repairing cattle-stalls, and threw overboard three cattle that died in the hold. Midnight ends—fresh, increasing gale. Ship rolling heavily, and taking heavy water on deck.

*Wednesday, November* 19, A. M. Increasing gale, with hard rain-squalls; high sea getting up. At 2:30 A. M., washed several cattle-stalls away on the after-deck. Some cattle rolling about the decks. Hove ship to, and slowed engines. All hands employed securing the loose cattle and repairing stalls. At 8 A. M., set fore lower top-sail, and kept ship on her course. At 11 A. M., gale veered west with great violence. In top-sail, and brought ship to the wind. Battened all hatches down. Ship laboring heavily, and taking in heavy water fore and aft. Noon, cattle-stalls give way on the after-deck. Cattle all washing and rolling about the decks. All hands commenced throwing the cattle overboard. P. M., blowing a hurricane; a high cross-sea running; ship laboring heavily. Started starboard bulwark, with weight of the cattle rolling against it. Cattle washing and rolling about the after-deck; all hands throwing them overboard. 4 P. M., continues blowing a hurricane. At 8 P. M., gale moderating; kept ship S. E.; set fore trysail; ship laboring heavily. At 9 P. M. took off fore hatch for ventilation; found in the between-decks cattle-stalls all down; several dead. Midnight, moderate breeze.

*Thursday, November* 20, A. M. Moderate breeze; ship rolling heavily; a high cross-sea running. At daylight commenced throwing dead cattle overboard. After between-decks, several dead cattle and some stalls broken down. A quantity of water washing about the after between-decks. Noon, fresh increasing gale from southward. P. M.. fresh increasing gale and high cross-sea running; ship laboring heavily, and taking heavy water on deck. All hands employed throwing the dead cattle overboard. At 5 P. M., violent gale blowing; battened all hatches down fore and aft. Several cattle-stalls on upper deck forward, washed away; cattle getting adrift, and rolling and washing about the decks. Several washed overboard. Midnight, gale moderating and sea going down.

*Friday, November* 21*st*. Gale moderating, and high cross-sea running; ship rolling heavily. At daylight, commenced throwing the dead cattle overboard out of the fore and aft between-decks. Five horses and three cattle left alive in the fore between-decks, and all dead in the after between-decks. P. M., high cross-sea running, and ship rolling heavily. At 6 P. M. got all dead cattle overboard, and commenced bailing water out of after between-decks. On looking around the ship found the starboard after-boat stove in and rails broken, ventilators washed down and broken, two stanchions started in the after between-decks.

*Saturday, November* 22*d*. Moderate breeze and clear weather. At daylight commenced taking out the dead cattle on the deck forward. Carpenter repairing stalls for the 35 cattle left.

These were the entries in the log, and the testimony of such of the officers of the ship as could be found after the libel was filed, show the storm to have been of the severest character.

It appears that the gale began at midnight on Tuesday, with the ship taking large quantities of water on deck, and continued with increasing violence, the stalls on the after-deck giving way about noon on Wednesday. This destroyed not only the cattle on the after-deck, but broke down the ventilators so that the cattle below, the hatches having to be battened down, were without any ventilation. The gale continued throughout Wednesday, doing more damage to the ship and to the cattle fittings on deck, and made it necessary to keep the hatches down until 9 o'clock in the evening. On Thursday morning the gale had moderated, but increased again in the afternoon, when

the stalls on the forward deck were broken down and the cattle were washed about the deck, and some of them carried overboard. The hatches were again battened down, and so continued until midnight of Thursday. I think the proof is quite convincing that experience has shown that no cattle fittings of a temporary nature, and without a permanent shelter deck over them, can be constructed which can be depended on to withstand a continuous gale of this character.

It is shown that the Rathmore, a steam-ship which sailed from Baltimore on November 18th with cattle, and which on the 20th encountered this same gale, although she was also a steam-ship which had previously carried cattle successfully, and had stalls constructed upon an improved plan, had nearly all her cattle-stalls forward of the bridge carried away, and suffered such damage that she put back to Baltimore, with a loss of 64 cattle and with others badly injured. The official survey of the Rathmore shows that the cattle pens were broken and mashed up, both forward and aft, on the main deck, and that between-decks some were broken down and more or less damaged by the heavy rolling and lurching of the ship.

It is contended that the fact that the stalls between-decks on the J. C. Stevenson did not stand, shows that they must have been improperly constructed. But the fact that many of the beasts had died of suffocation, and that a large weight of water had got down into the between-decks through the broken ventilators, and was washing the carcasses about as the vessel rolled, is, in my judgment, sufficient to account for the destruction of the stalls. Sufficient appears to make it evident that, except on a vessel specially constructed for the protection of cattle, their safe carriage across the Atlantic is much a question of good or bad weather on the voyage, and that, with bad weather and heavy seas sweeping the decks, temporary fittings will give way, and the cattle be lost, and if the cattle are between-decks the ventilators will be broken down and water get below, and their safety thus imperiled. Upon the whole testimony, I do not find that, considering the contrivances then in use for carrying cattle, and the known risks and uncertainties of the business, and the character of the vessels customarily used, that this steam-ship would then have been considered unsuitable for the business, or that the fittings were improperly constructed. I think the steam-ship and the fittings were as good as were ordinarily provided and used at that time.

It remains to consider what were the liabilities incurred by the steamer by her delay in arriving at Baltimore to perform the contract dated September 22, 1879, in which it is provided that "Mr. Francis Bell agrees to ship in the steam-ship J. C. Stevenson, to sail from Baltimore for London on the twelfth day of October, or thereabouts, (seven days' notice having been previously given by the agents of the steam-ship to the shipper,) 380 cattle, subject to the following conditions," etc. The steamer did not arrive in the port of Baltimore until November 4th, and did not take the cattle on board until No-

vember 13th, and sailed on the 14th. This was a delay of about one month.

Damages of various kinds are claimed in the libel for this delay; but, in my opinion, the damages on this ground cannot be extended beyond such as had accrued up to the time the cattle were put on board. The libelant, when the vessel did not arrive, had his right of action for breach of the contract, and could have recovered the expenses of keeping the cattle and any additional freight he might have had to pay if he sent them forward by another ship, and the additional insurance premium he might have had to pay if the premium was increased by the lateness of the season. As the ship, when she did arrive, was accepted by him, and did in part perform the contract by their taking the cattle with his consent, all he can recover is the cost of keeping the cattle during the delay, and the increased rate of insurance premium actually paid by him. It is a question not free from doubt, perhaps, whether for these items of damage the libelant has a lien on the ship; but as the cattle were actually laden on board under the contract, reference being specially made to it in the bill of lading, and as the ship obtained the benefit of the contract it seems to me within the spirit of the decisions that she should be held for the delay in receiving them on board. *Oakes* v. *Richardson,* 2 Low. 173.

I will sign a decree in favor of libelant, with a reference, if required, to ascertain the expenses of keeping the cattle for, say, one month, and the extra premium actually paid by libelant in excess of what he would have had to pay for the same insurance if the ship had sailed on the fourteenth of October.