GUFFEY v. ALASKA & P. S. S. CO.

(Circuit Court of Appeals, Ninth Circuit. May 3, 1904.)

1. SHIPPING—MARITIME LIEN.

Where, at the time complainant delivered goods on the wharf of a transportation company under a bill of lading reciting that the goods were to be shipped on board defendant company's vessel or vessels "now" lying at the port of S., complainant had knowledge that defendant's chartered vessel, the R. D., by which it was expected to ship the goods, was then either on the high seas or in a distant port, and the goods were never delivered to the master or officers of such vessel, the vessel was not

subject to a maritime lien for defendant's breach of the contract of affreightment.

2. SAME—STATUTES—CONSTRUCTION.

Ballinger's Ann. Codes & St. § 5953, providing that all steamers, vessels, etc., are liable for the nonperformance or malperformance of any contract for the transportation of passengers or property between places within the state, or to or from places within the state, made by their respective owners, masters, agents, or consignees, does not create a lien on a vessel for breach of a contract of affreightment made by her charterer.

3. SAME—APPEAL—COSTS—OBJECTION TO TRIAL.

In the absence of a showing in the record that an objection to the allowance of certain costs was brought to the attention of the trial court by appeal from the clerk's taxation or otherwise, such objection will not be reviewed.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Wm. Martin and W. A. Keene, for appellant.

Hoyt & Haight, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge. The Alaska & Pacific Steamship Company, a corporation organized under the laws of the state of Washington, was engaged in operating the steamships Brunswick and Robert Dollar as carriers of freight and passengers between the ports of Seattle, Wash., and Nome, Alaska. It was operating the Robert Dollar under a charter party which was a demise thereof from the owner. On or about October 5, 1900, the libelant placed upon the dock used by the steamship company at Seattle certain freight to be shipped to Nome, and received therefor from the company a bill of lading. By the terms of the bill of lading, the vessel was relieved from liability from certain causes, among which were stranding, disasters or dangers of the sea, unavoidable detention or delay, stress of weather, inability to procure lighterage, or other unavoidable circumstances or casualty. It mentioned no vessel on which the goods were to be shipped, but it recited that they were shipped on board the appellee's vessel "employed or operated by it, and now lying at the port of Seattle and bound for Nome City * * * to be carried at the option of said company upon said vessel or upon any other of said company's vessels." At that time the Robert Dollar, on which it was understood that the shipment would be made, was on her round trip from Seattle to Nome and return, and was supposed to be nearly due to return to Seattle. Owing to extremely stormy weather at Nome and at St. Michaels, she was delayed, and did not return to Seattle until October 29, 1900; and then, owing to the storms and ice of winter, it was too late to make another trip that season. About November 1, 1900, the Robert Dollar sailed from Seattle to San Francisco, and was delivered to her owner. The appellant's goods were never placed on board the Robert Dollar, or in charge of her

¶ 2. Maritime liens created by state laws, see note to The Electron, 21 C. C. A. 21.

master or of any of her officers. They lay upon the dock until October, 1901. The charter party, by its terms, denied to the charterer the power to subject the vessel to liens, required it to pay all charges against her, and stipulated that neither the owner nor the vessel should be liable to any party whatsoever for either delivery or loss or damage to cargo, or for breach of any contract of affreightment or transportation, and that all liability for any and all such matters should be borne by the charterer. It stipulated further that, while the owner should have the right to nominate the captain and chief engineer of the vessel, they and the crew should be the servants and agents of the charterer, and not the servants or agents of the owner. The appellant had no knowledge that the vessel was chartered, but supposed her to belong to the steamship company; nor did any fact come to his notice, so far as the evidence shows, to put him upon inquiry to ascertain whether or not she was chartered. The appellant brought his libel against the ship to subject her to his claim of lien for damages for breach of the contract. The District Court denied the lien on the ground that the goods had never been placed on board the ship, or in the custody of her master, and dismissed the libel.

We think that the court committed no error in holding that under the general maritime law the contract of affreightment created no lien upon the vessel. In 1 Parsons on Shipping & Admiralty, 183, it is said:

"The reception of the goods by the master on board of the ship, or at a wharf or quay near the ship, for the purpose of carriage therein, or by any person authorized by the owner or master so to receive them, or seeming to have this authority by the action or assent of the owners or master, binds the ship to the safe carriage and delivery of the goods."

The delivery in the present case responds to all the requirements of this proposition of the text-writer, except that the goods were not delivered in the presence of or near the ship. The ship at that time, the appellant well knew, was either at Nome or on the high seas. The recital in the bill of lading that the goods were shipped on board the Alaska & Pacific Steamship Company's vessel or vessels employed or operated by them, "and now lying at the port of Seattle," does not have the effect to contradict the known facts. The case is not embarrassed by the acquisition of rights under the bill of lading by a bona fide purchaser or transferee. Coupled with the known facts, the bill of lading was, in effect, a receipt by the steamship company of the goods on their wharf, for which freight had been paid, and an obligation to ship them on the Robert Dollar on her next trip. The lien imposed upon a vessel by a contract of affreightment and delivery of the goods to the vessel is stricti juris, and cannot be extended by analogy or by inference. The Kiersage, 2 Curt. 424, Fed. Cas. No. 7,762; Vandewater v. Mills, 19 How. 90, 15 L. Ed. 554. There is no case holding that the owner or agent of a vessel can, by a mere contract of affreightment made at her port while the vessel was on the high seas, thereby subject her to a lien. There are some decisions and dicta of the Supreme Court which indicate the trend of its opinion to the doctrine that the lien is to be

130 F.—18

restricted to narrow ground, and is to be recognized only in cases of actual delivery to the ship, or to her master or officers. In The Schooner Freeman v. Buckingham, 18 How. 182, 15 L. Ed. 341, Mr. Justice Curtis said:

"Under the maritime law of the United States a vessel is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment; but the law creates no lien on the vessel as a security for the performance of a contract to transport cargo until some lawful contract of affreightment is made, and a cargo shipped under it."

This was said in a case which involved the validity of bills of lading of property not shipped on the vessel, but designed to be instruments of fraud.

In Vandewater v. Mills, 19 How. 82–90, the court said:

"If the cargo be not placed on board, it is not bound to the vessel, and the vessel cannot be in default for the nondelivery in good order of goods never received on board. Consequently, if the master or owner refuses to perform his contract, or for any other reason the ship does not receive cargo and depart on her voyage according to contract, the charterer has no privilege or maritime lien on the ship for such breach of the contract by the owners, but must resort to his personal action for damages."

In Bulkley v. Naumkeag Steam Cotton Co., 24 How. 386, 16 L. Ed. 599, it was held that the requirement that there be a delivery to the vessel was complied with in a case where the delivery of bales of cotton was made to a lighterman employed and paid by the master of the vessel, and who was in the act of conveying the bales to the vessel, for the purpose of putting them on board, when an explosion of the boiler threw them into the water; that the delivery of the cotton to the lighterman was a delivery to the master; and that the transportation by the lighter to the vessel was the commencement of the voyage in execution of the contract, the same, in judgment of law, as if the bales had been placed on board of the vessel instead of the lighter. In King v. The Lady Franklin, 8 Wall. 325, 19 L. Ed. 455, the bill of lading had been given by one who was the agent of several vessels, all engaged in transporting goods from Milwaukee to Port Sarnia, but having separate owners, and not connected by any joint undertaking. The bill of lading, by mistake of the agent, acknowledged that certain goods had been shipped on the Lady Franklin, when in fact they had been previously shipped on another vessel, for which a bill of lading had been given accordingly. It was held that the Lady Franklin was not responsible for the loss of the goods by the other vessel. Mr. Justice Davis said:

"In this case the bill of lading acknowledges the receipt of so much flour, and is prima facie evidence of the fact. It is, however, not conclusive on the point, but may be contradicted by oral testimony. The doctrine that the obligation between ship and cargo is mutual and reciprocal, and does not attach until the cargo is on board, or in the custody of the master, has been so often discussed, and so long settled, that it would be useless labor to restate it, or the principles which lie at its foundation."

These views were reaffirmed in The Keokuk v. Robson, 9 Wall. 517, 19 L. Ed. 744. In The Delaware v. Oregon Iron Co., 14 Wall. 579–602, 20 L. Ed. 779, the court said:

"Bills of lading, when signed by the master, duly executed in the usual course of business, bind the owners of the vessel, if the goods were laden on

board, or were actually delivered into the custody of the master; but it is well-settled law that the owners are not liable, if the party to whom the bill of lading was given had no goods, or the goods described in the bill of lading were never put on board, or delivered into the custody of the carrier or his agent."

In this dictum of the court it is implied that a good delivery may be made not only to the master, but to the carrier or his agent; but, in view of other utterances of the court, we have no reason to think the language so used was intended to be understood as saying that a mere delivery to the carrier or his agent, evidenced by a bill of lading, would, in the absence of the vessel, and in the absence of knowledge on the part of her master or officers of such delivery, be a constructive delivery to the ship, such as to bind her to the safe carriage of the goods. In Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998, a bill of lading was issued by the general agents of the owner of a steamboat, when in fact the goods referred to therein were not shipped on the steamboat, or delivered at its wharf or to its agents for shipment; the statement in the bill of lading to that effect being untrue. The court, by Mr. Justice Miller, said:

"Before the power to make and deliver a bill of lading could arise, some person must have shipped goods on the vessel. Only then could there be a shipper, and only then could there be goods shipped. In saying this, we do not mean that the goods must have been actually placed on the deck of the vessel. If they came within the control or the custody of the officers of the boat for the purpose of shipment, the contract of carriage had commenced, and the evidence of it, in the form of a bill of lading, would be binding; but without such a delivery there was no contract of carrying, and the agents of it had no authority to make one."

Conceding that some of these deliverances of the court announce propositions not necessarily involved in the cases that were before it, and that they are dicta, they are nevertheless dicta of eminent jurists, learned in the law, sitting in the highest court of the land, and, as such, they are entitled to the highest consideration. They have been so regarded in the decisions of the inferior federal courts.

In Campbell v. The Sunlight, 2 Hughes, 9, Fed. Cas. No. 2,368, it was held that delivery of freight to a lighter moored alongside and in charge of the vessel for the shipment on the vessel, where it was the custom of trade to deliver in that way, and where a receipt was given by the master, is a good delivery, and binds the vessel. Said the court:

"It is well-settled law that the reception of the goods by the master on board the ship, or at a wharf or quay near the ship, for the purpose of a carriage therein, or by any person authorized by the owner or master so to receive them, binds the ship to the safe carriage and delivery of the goods."

In Scott v. Ira Chaffee (D. C.) 2 Fed. 401, Mr. Justice Brown—then district judge—held that the owner of a cargo has no lien upon a vessel for the breach of a contract of affreightment until the cargo, or some portion of it, has been laden on board or delivered to the master. The Caroline Miller (D. C.) 53 Fed. 137, was a case in which the steamer was running under a charter party to a steamship line from Brunswick to New York. The bill of lading was signed, not by the master of the steamer, but by the agent of the charterer.

The master had nothing to do with the loading of the steamer or with the appointment of the agent. The cotton referred to in the bill of lading was never put on board. It was held that the steamship was not liable in rem for the missing bales, because they were never put on board the steamer, and never came into the possession of the master, or under his control. The court said:

"But here the master did not sign any bill of lading or undertake to bind the ship, and the missing cotton never came under his control. The agent of the New York & Brunswick Steamship Line who signed this shipping document was not the agent of the shipowner, nor of the master. The delivery of goods to that agent was therefore neither a delivery to the master, nor a delivery to the ship."

In The Guiding Star (D. C.) 53 Fed. 936, the owners of certain steamboats had formed an association, and, by a writing signed by the masters of each boat, had appointed a common agent, with authority to sign bills of lading, under an arrangement by which the bills were frequently signed on delivery of the goods at the landing; the goods to be taken by the first boat of the association which passed. The name of the particular boat was usually entered in the bill when the goods were received on board. The court, recognizing the distinction between a common-law delivery to a carrier and a delivery to a vessel, ruled that the bills so signed were binding upon the principal, and that a delivery of the goods at the landing was a valid delivery, but that there was no lien upon a vessel in respect to goods for which her agents had issued a bill of lading, but which were destroyed while in the custody of the keeper of the landing, before being received on board or coming under the control of the master. In The Vigilancia (D. C.) 58 Fed. 698, it was held that there can be no delivery to a ship, in the maritime sense, either of supplies or cargo, so as to bind her in rem, until the goods are either actually put on board the ship, or else brought within the immediate presence or control of her officers. The court in that case pointed out the distinction between a common-law delivery to the company sufficient to bind the company in personam, and a delivery to the ship so as to bind the ship in rem. The Protection (decided by this court) 102 Fed. 516, 42 C. C. A. 489, was a case in which the owner of a steam sled sawing machine and sled runners, at Seattle, contracted for the transportation of the same on the steamship Protection from Seattle to Skaguay. The machine and sled runners were delivered to the ship's tackle on the dock at Seattle, freight and wharfage thereon having been paid; and a bill of lading was issued by a duly authorized agent of the company, reciting that the machine and sled runners had been shipped in apparently good order on board the steamship Protection. In that case, although no question was made of the jurisdiction in admiralty to enforce a lien on the vessel for failure to carry out the contract, this court sustained the lien. Under the circumstances, the delivery to the ship's tackle on the dock was, without doubt, a delivery to the vessel. In The S. L. Watson, 118 Fed. 945–952, 55 C. C. A. 439, the Circuit Court of Appeals for the First Circuit, through Putnam, Circuit Judge, said:

"The rule of admiralty, as always stated, is that the cargo is bound to the ship, and the ship to the cargo. Whatever cases may have been decided other-

wise disregarded the universal fact that no lien arises in admiralty, except in connection with some visible occurrence relating to the vessel or cargo, or to a person injured. This is necessary in order that innocent parties dealing with vessels may not be the losers by secret liens, the existence of which they have no possibility of detecting by any relation to any visible fact."

There are some early decisions which it may be conceded go to the full extent of sustaining the doctrine contended for by the appellant. Such were The Flash, Abb. Adm. 67, Fed. Cas. No. 4,857, and The Pacific, 1 Blatchf. 569, Fed. Cas. No. 10,643. In the latter case, Nelson, Circuit Justice, held that it was not necessary, in order to give jurisdiction over a maritime contract, that the ship must have entered upon the performance thereof, and said:

"The owner is bound as soon as he or the master settled the terms upon which the ship is to enter upon the service, and it is difficult to perceive why the liability of the latter should be postponed until the inception of the performance."

Both of these decisions were rendered prior to that of Freeman v. Buckingham. In The Hermitage, 4 Blatchf. 474, Fed. Cas. No. 6,-410, Mr. Justice Nelson, probably in view of intervening decisions of the Supreme Court, used language to indicate that his former ruling in the case of The Pacific was unsound. As early as the case of The Monte A. (D. C.) 12 Fed. 331, Brown, District Judge for the Southern District of New York, said—and of that there can be no doubt—that The Flash and The Pacific must be deemed overruled by subsequent decisions. But in the case of The Towboat James McMahon, 10 Ben. 103, Fed. Cas. No. 7,197, Judge Benedict seems to have reaffirmed the doctrine of The Pacific. In that case an agreement had been made by the owner of a canal boat with the towboat to tow the former, and the consideration therefor was paid. The canal boat was ready at the appointed place to be taken in tow. There was a breach of the contract. It was held that there was a cause of action in rem against the towboat. The court said:

"The contract sued on is the maritime contract itself—maritime because it was an agreement to transport a vessel upon navigable waters, and perfected as a contract by the payment and receipt of the towage money. The liability of the owner was complete."

The court remarked that Vandewater v. Mills had been commented upon by the Supreme Court in Bulkley v. Naumkeag Steam Cotton Co., and that pains had there been taken to limit its effect, "for," continued the court, "it is treated as laying down no different rule from that declared in Freeman v. Buckingham." Of similar import is Pearce v. The Thos. Newton (D. C.) 41 Fed. 106. In that case goods were shipped by the Clyde Line from Philadelphia to South Mills, N. C. The Clyde Line regularly ran a vessel to Norfolk, and there transferred to its connecting carrier, the Thomas Newton. The vessel on which the goods were received at Philadelphia carried them to Norfolk, and there by an agent of the Clyde Line they were placed and stowed upon a wharf where the Newton regularly received her freight. Before the arrival of the Newton they were injured by a flood. It was held that the lien upon a vessel for the safe custody and due transfer of goods to be shipped in her attaches

at the time of delivery of such goods to her agents and owners, and that the Newton was liable in rem. Other cases are cited by the appellant, such as the City of Alexandria (C. C.) 28 Fed. 202, and The Oregon, Deady, 179, Fed. Cas. No. 10,553, but they are all believed to be reconcilable with the doctrine of the Supreme Court decisions above alluded to.

But it is urged that, if there be no lien upon the vessel under the general maritime law, a lien is afforded by the statute of Washington (2 Ballinger's Ann. Codes & St. § 5953), which, by subdivision 5, declares that all steamers, vessels, and boats, their tackle, apparel, and furniture, are liable "for the non-performance or mal-performance of any contract for the transportation of persons or property between places within this state or to or from places within this state made by the respective owners, masters, agents or consignees." We need not enter into a discussion of the interesting and somewhat difficult question whether a state Legislature has the power to so far derogate from the general maritime law as to create a lien enforceable in the courts of admiralty upon a vessel for breach of a contract of affreightment in a case where there is no actual delivery of the cargo to the vessel or her master or other officers. It is sufficient, we think, to refer to the fact that the statute in question does not by its terms include a contract of affreightment made by a charterer. The contract in this case was made, not by an owner or master, agent or consignee. It was made by the Alaska & Pacific Steamship Company, the charterer. It is unnecessary to cite authorities to the point that such a lien law is to be strictly construed. It is true that in some contracts and in some relations the charterer by a demise is to be deemed the owner pro hac vice. But in construing a statute which specifies only that the lien may be created by the owner, master, agent, or consignee, we know of no rule or principle of construction which authorizes us to read into it the word "charterer." The facts that the appellant contracted with the charterer, and delivered his goods to it, in ignorance of the charter party, and under the supposition that the appellee was owner, and without the knowledge of facts sufficient to put him upon inquiry to ascertain whether such was the case, can have no bearing upon the construction of the statute. They are circumstances that might be of controlling importance in a case where the owner, having parted with the possession of his vessel to a charterer, asserts a lien under the general maritime law for the freight (Drinkwater v. The Spartan, 1 Ware, 149, Fed. Cas. No. 4,085), or in a case of damages to goods in transportation by a charterer (The Euripides [D. C.] 52 Fed. 161), or where supplies have been furnished a chartered vessel in a foreign port at the instance of the charterer (The India [D. C.] 14 Fed. 476; The Bombay [D. C.] 38 Fed 512), or in a case of liability for negligence resulting in a collision of a chartered vessel in possession of the charterer (The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954). The question here is not one of the right of a person who has dealt with a charterer on the supposition that he is the owner, and there is no question of apparent authority or of estoppel involved. It is one purely of the construction of the letter of a lien

statute. The Legislature has seen fit to extend the lien only to contracts made by the owner, or those to whom he has confided authority. We held in The South Portland, 100 Fed. 494, 40 C. C. A. 514, in a case where a lien was asserted under section 3 of the act of the Washington Code above referred to, that it was immaterial whether one who procured necessary equipment for a steamer, of which he was in the possession, were the charterer in possession or the owner; but that section of the statute provides a lien for one who furnishes such equipment to vessels "at the request of their respective owners, masters, agents, consignees, contractors, sub-contractors or other person or persons having charge in whole or in part of their construction, alteration, repair or equipment and every contractor, sub-contractor and builder, or person having charge either in whole or in part of the construction, alteration, repair or equipment of any vessel, shall be held to be the agent of the owner for the purposes of this chapter." We know of no case in which it has been held that the word "owner," so used in a statute creating a lien, is sufficiently comprehensive to include a charterer. The contrary has been held by Seaman, District Judge, in The C. W. Moore (D. C.) 107 Fed. 957, in a case in which the statute of Illinois created a lien against vessels for rental of wharfage privileges, and prescribed that those who may subject a vessel to such lien are "the owners or part owners, master, clerk, steward, agent or ship's husband."

The appellant, in his brief, makes the point that the court erred in taxing costs in the sum of $100, the premium paid on the claimant's bond for the release of the vessel, and $12.50 premium paid on the claim and stipulation for costs. Objection was made by the appellant to these items of the cost bill, but no appeal to the court was taken from the ruling of the clerk thereon. Nor is the allowance of these items of costs by the lower court assigned as error. In the absence of a showing in the record that this matter was brought to the attention of the lower court by appeal or otherwise, or submitted to its decision, this court has no power to review the ruling of the clerk, or that portion of the decree thereon rendered. The Robert Graham Dun, 70 Fed. 270, 17 C. C. A. 90.

The decree of the District Court will be affirmed.