## THE ASK.

(District Court, E. D. Pennsylvania. May 6, 1912.)

### No. 46.

1. ADMIRALTY (§ 28*)—ACTION IN REM FOR DAMAGES TO CARGO—LIEN TO SUPPORT.

A suit in rem for damage to cargo rests upon a maritime lien which comes into existence at the time the injury is done, and no lien exists in favor of a shipper until cargo is actually shipped.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 278–288; Dec. Dig. § 28.*]

2. ADMIRALTY (§ 28*)—INJURY TO CARGO—ACTION IN REM.

A steamer under a time charter for use exclusively in the fruit trade, on arriving at a Cuban port where she was to take on a load of bananas for Philadelphia, at once drew her fires and commenced cleaning her boilers, which work was completed in less than the usual time, but, before that time expired, she had been loaded by a shipper. It was discovered on her arrival there that there was an error in one of her clearance papers which required her to go to another port before she could clear for the return voyage, and that also consumed several hours. When she arrived at Philadelphia the bananas were overripe, which lessened their market value. *Held,* on the evidence, that the delay was not due to any fault chargeable to the ship which rendered her liable in rem to the shipper; it appearing that the clearance papers containing the mistake were obtained in New York by an agent of the charterer, and that the cleaning of the boilers at the time was necessary in the judgment of the officers.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 278–288; Dec. Dig. § 28.*]

In Admiralty. Suit by the Simon Fruit Company against the Danish steamship Ask. On final hearing. Decree for respondent.

Francis S. Laws, of Philadelphia, Pa., for libelant.

John M. Woolsey, of New York City, and Edward F. Pugh, of Philadelphia, Pa., for respondent.

J. B. McPHERSON, District Judge. [1] This action in rem was brought against the Danish steamship Ask by the Simon Fruit Company, a Delaware corporation. It is based upon the charge that the steamship improperly delayed beginning a voyage from Sagua de Tanamo, Cuba, to Philadelphia, whereby a cargo of bananas became too ripe, and was much impaired in market value. It is desirable that the relation of the parties should be clearly understood. The facts are these: In March, 1907, J. Simon & Co. (a partnership distinct from the Fruit Company) took possession of the Ask under a time charter which lasted until the end of the following August. The ship was chartered for the fruit trade exclusively, although the charter party contains some general printed language at variance with this statement. The fact is not vital, I think; but, in any event, it is conceded that she was chartered for this trade only, and she was certainly not used for any other purpose. She was therefore a special, and not a general, ship, and her character was well known to all the parties concerned. She had no relation whatever to the Fruit

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Company until August 3d, when the company put a cargo of bananas on board at Tanamo, and became a consignor by that act. The Fruit Company had nothing to do with the charter party, and, if it has any right to an action in rem against the steamship, such right must be based on the contract of shipment, and the acts or omissions of the steamship thereunder. If the ship violated the charter party before the Fruit Company put the bananas on board, such violation could not become the foundation for an action in rem by the Fruit Company. This kind of action rests upon a maritime lien that comes into existence at the time the injury is done, and no lien exists in favor of a shipper until cargo is actually shipped. This is the general rule, and it is therefore not clear that the present action has the necessary support; but, as the facts bring the dispute near the border line, I have decided to dispose of the case on its merits.

[2] It is evident that close relations of some kind existed between the Fruit Company and the charterers, the firm of J. Simon & Co., and also between each of these associations and the Atlantic Fruit Company; this being a corporation with large interests in the fruit trade. Whatever these relations may have been precisely, this much is certain: These three legal persons were working in harmony and knew each other's business well. The ship had already made 10 voyages under the charter, and early in August approached the island of Cuba on the voyage in question. On the evening of Friday, August 2d, she reached a point several miles from Tanamo, her port of destination. Some complaint is made because the captain declined to enter the port at night. He went in at an early hour the following morning, but, as this has little if any important bearing upon the delay that occurred afterwards, I pass it without further remark. The ship came to anchor on Saturday about 7 o'clock, and one of her clearance papers was at once discovered to be erroneous. The mistake would require her to go to Nipe, the port of entry for that revenue district, before she could clear for the return voyage. Immediately upon coming to anchor, she drew her fires, blew off steam, and prepared to clean her boilers, finishing the work about 4 o'clock on Sunday morning. Meanwhile, beginning at 11 o'clock on Saturday, the Fruit Company began to put the bananas on board, and finished loading about 1 o'clock on Sunday morning. By 11 o'clock of that day the vessel had steam up and was ready to go to sea, but for some reason not very clearly explained she did not start for Nipe until 5 o'clock in the afternoon. She reached that port shortly before 9 o'clock, and at midnight an agent of the Fruit Company, who had accompanied the ship from Tanamo, went ashore for the purpose of correcting the mistake in the papers. But the collector was not accessible, and nothing could be done before Monday morning. At 8 o'clock of that day the master went ashore on the same business, and returned to the ship in about two hours. He was further delayed by the health officer of the port, but finally sailed at a few minutes past 12. He reached Philadelphia at 11:30 in the morning of Sunday, August 11th, but the cargo could not be discharged until the next day, and, when it finally reached the market, the fruit was overripe, so that it sold for a good deal less than the market price for fruit in good condition. No

complaint is made about the vessel's speed between Nipe and Philadelphia; the only dispute being about the occurrences in the Cuban ports.

It is charged that the ship was at fault in two particulars: First, because she sailed from New York with irregular clearance papers. The details are not essential. It is agreed that one of her papers contained an erroneous statement, and that this required her to go from Tanamo to Nipe before she could clear for the return voyage. This retarded the delivery of the fruit by nearly a day, but I am satisfied that the mistake in the paper was not the fault of the ship, but of the broker in New York who was acting for the charterer's agent, the Atlantic Fruit Company, and was responsible for the proper clearing of the vessel. There is a conflict of evidence on this subject, but I find the fact in favor of the ship. Evidently the broker, if he could have contradicted the captain, would have been a most important witness on behalf of the libelant; but he was not called, and the libelant cannot complain if unfavorable inferences are drawn from his unexplained absence.

The second, and the principal, ground of complaint is, because the ship drew her fires and cleaned her boilers immediately upon her arrival at Tanamo, thereby delaying the return voyage by several hours. It is said that this act was prejudicial for either of two reasons: (1) If steam had been kept up, the ship could have gone to Nipe at once before loading began, and could have returned in a few hours, thereby saving the time that was afterwards consumed at Nipe owing to the fact that she arrived at that port on a Sunday; but (2) even if the necessary detour to Nipe had been deferred until the fruit had been loaded, it is urged that, if the ship had kept steam in her boilers, she could have left Tanamo at least one-half day before she actually started. It is true that either of these courses could have been pursued if the fires had been maintained, but it still remains to be decided whether the ship was at fault in drawing the fires and in taking the necessary time to clean her boilers. No complaint is made that the process was needlessly slow; on the contrary, it appears to have been unusually rapid. The only objection is that it should not have been undertaken at all. That, of course, depends on the circumstances. Boilers will become dirty, and they must sometimes be cleaned if they are to maintain their efficiency. This vessel was bound to the utmost dispatch, and she was also obliged to keep her machinery in such condition that she could perform her obligations under the charter party. Whether a Danish law requires the boilers of a Danish steamship to be cleaned after use during 1,000 hours was not proved by the proper kind of evidence; but it does appear clearly that the captain believed that such a law existed, and there is no doubt that such belief influenced him decidedly in his repeated insistence that the boilers must receive attention. It is not denied that he spoke strongly upon this subject to the charterer when he was in Cuba upon the voyage immediately preceding, and (although the fact is disputed) I find it to be true that the charterer gave him a written communication upon this subject addressed to the firm's agent in New York. This paper was evidently of much importance, but apparently the charterer made

no effort either to produce it or to account for its absence. No one denies that such a paper existed. Two witnesses called on behalf of the libelant testify only that they "do not remember" it, and I think it significant that the person to whom the paper would naturally have gone in the usual course of business and to whom the captain testified that he had delivered it was not called as a witness, nor was his absence explained. I feel justified, therefore, in taking the ship's view of this disputed point, and in finding as a fact that the captain had insisted that he must clean his boilers upon the next trip to Cuba, and that he was justified in believing from what took place in New York that he would be permitted to do so. Both he and his engineer believed the work to be necessary, and their opinion is entitled to weight. He certainly acted with promptness, for he began immediately upon coming to anchor at Tanamo, and proceeded with such unusual diligence that he finished in 30 hours, instead of the customary 36. Undoubtedly some of the delay in beginning the return voyage was due to this work, but, as I have just stated, the delay was not a fault of the ship. If it was a fault at all, it is properly chargeable against the charterer.

These being the only faults complained of, it follows that the libelant has no ground of complaint against the ship, even if an action in rem against the vessel can be sustained.

A decree may be entered dismissing the libel, with costs.