## THE SATURNUS.

### (Circuit Court of Appeals, Second Circuit. April 10, 1918.)

### No. 177.

SHIPPING ☞133—CARRIAGE OF GOODS—BREACH OF EXECUTORY CONTRACT—LIEN.

Libelant contracted to sell a large quantity of oil cake to a representative of the Dutch government to be delivered at New York on board vessels to be furnished by the purchaser. One of such vessels refused to go to the pier designated by libelant for loading, and libelant was compelled to move the cargo, at considerable expense, to a distant pier, which it did under protest. The contract required libelant to pay demurrage for delay beyond the specified lay days, but contained no provision requiring the vessel to load at the place chosen by libelant although that was required by the custom of the port. *Held* that, conceding that her refusal was a breach of the contract, such contract so far as related to the particular vessel was then executory, and that, the vessel and cargo not having at that time assumed the relations which give rise to a mutuality of liens as recognized by the maritime law, although they afterward did, there was no lien on the vessel for the resulting damages.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Midland Linseed Products Company against the steamship Saturnus; the Koninklije Nederlandsche Stoomboot Maatschappji, claimant. Decree for claimant, and libelant appeals. Affirmed.

For opinion below, see 242 Fed. 173.

The libel alleges that the Midland Company sold to certain persons a large quantity of oil cake, deliveries to extend over several months. The cake was to be put on shipboard at New York, and the purchasers agreed in writing to pay for it against bills of lading, to give three weeks' notice of readiness of steamers, and that the Dutch government would "tender you (Midland Company) steamers to load full cargoes according to the terms of the Baltimore charter party Form C., with the exception of demurrage," which was to be much higher than the rate of the printed form. While not so pleaded, it is admitted that the cake was bought for and belonged to the government of Holland.

The libel alleges that libelants were "advised by the agents of S. S. Saturnus" that that steamer "was tendered * * * under the contract of sale" for loading a full cargo of cake. Thereupon libelants ordered her to a certain pier to load, but she wrongfully refused to go there, although by the custom of the port of New York "and under said Baltimore charter party Form C" she was bound so to do. The steamer's agents then notified libelant that she would receive cargo at another pier several miles distant from the one chosen by Midland Company, and to that pier libelants under protest transported the cake, incurring therefor an expense of $1,287. These charges were for lighters and tugs, and arose necessarily before any cake went aboard the Saturnus, or came into the possession, custody, or control of any agent of the vessel.

No charter party of Saturnus, either in the Baltimore form or otherwise, was ever made to libelant; that form relates solely to "heavy grain" cargoes, and is in many respects wholly unsuited to the present venture. It does contain provisions as to loading, and expressly provides for demurrage for delay in loading, but neither expressly nor by implication of words requires steamer to go to such safe pier at the loading port as might be chosen

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

by shipper or charterer. The plain inference from the exhibits attached to the libel is that the Saturnus was under the complete control of the Dutch government, and, whether formally chartered or not, looked for remuneration to that sovereign. The bills of lading specifically called only for freight "according to agreement" between that government and owners of ship.

Peremptory exception was filed to a libel in rem, by claimant, a private corporation owning the steamship, as follows: "The breach of contract alleged does not give a maritime or other lien against the Saturnus"—which exception was sustained and libel dismissed. Libelants appeal.

Everett, Clarke & Benedict and Herman S. Hertwig, all of New York City, for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for appellee.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge (after stating the facts as above). This is not an action for breach of charter, nor to enforce a maritime lien arising upon such breach, for these libelants never chartered. Benevolently reading the libel and exhibits, the most favorable statement of libelant's legal position is that the Saturnus was offered in fulfillment of a nonmaritime contract for the sale of oil cake, of which her owners presumptively had knowledge. By that contract Midland Company had agreed to furnish a cargo for a ship which turned out to be the Saturnus and to furnish a cargo within the time limited in a well-known printed charter form, or pay demurrage after the there stipulated lay days, which would begin on tender of vessel for loading. Therefore both ship and consignor had agreed to manage the lading according to the custom of the port unless varied by the charter form. That form contains no special provisions as to loading pier, but, by the custom, a ship at New York must go where ordered by shipper if the place is safe. Libelant-shipper named such a place, shipmaster or agent refused to go; therefore there was a breach—not of a charter but of what in effect was a contract of affreightment, and for a full cargo, which is maritime in its nature. On exception we must assume it as true that the custom of the port is as pleaded, and is to be read into the contract, and was violated to libelant's damage; and (since no argument has been based thereon) we pay no attention to any matters suggested by the obvious truth that most if not all libelant's dealings were with the sovereign of Holland as a disclosed principal.

It being agreed that no lien, and therefore no right in rem, exists for the breach of a contract, however maritime but remaining executory (The Ira Chaffee [D. C.] 2 Fed. 401, The Monte A. [D. C.] 12 Fed. 331, and cases cited), the libelant's case must rest on one thought which may be put in several ways: (1) Since a lien exists for breach of an executed affreightment contract, the time of breach is immaterial. (2) Lien arises out of performance or execution of contract, and therefore also time is immaterial. (3) The rights of carrier and shipper in respect of carriage of goods by water are mutual and reciprocal and so are their remedies; therefore, since the shipowner has a lien on cargo for unreasonable delays in loading, the rule of mutuality must include

a lien on ship for unreasonable (i. e., unlawful) expenses inflicted upon the shipper in respect of the same matter; and the additional expense of delivering cargo to a vessel at a berth violative of contract is the correlative or reciprocal of loading delay.

Such arguments suggest that the more complicated the modern maritime contract, and the greater therefore the possibility of partial breaches, there must ensue, if this libel is sustainable, a multiplication or extension of liens not hitherto encountered in admiralty jurisprudence. This, as well as the admitted paucity of direct authority on the point presently urged, justifies some investigation of the American doctrine of maritime lien as a jus in re or proprietary interest in the thing proceeded against and deemed a sort of defendant, personification, whose cause may be presented by any claimant able to show therein a jus of his own.

Remembering that not all liens have the same history or reason for existence, that bottomry (e. g.) rests on an express hypothecation, while the lien for necessaries is justified by an implied pledge, plus the assumed desire of the ship to plough the seas, and also that not every maritime contract (e. g., insurance) creates or supports a lien, it is plain that this libel rests on the asserted American application of the maxim, "Le batel est obligé à la marchandise et la marchandise au batel." [1] The Maggie Hammond, 9 Wall. at 449, 19 L. Ed. 772.

At this date it is idle to inquire whether it was with logical or historical accuracy that the freight lien which, as a growth of the custom evidenced by the quoted maxim, reciprocally bound ship and cargo to each other, was declared as at once established by general and ancient maritime law, and yet to be neither a hypothecation nor the privilege of the civil law (The Bird of Paradise, 5 Wall. at 555, 18 L. Ed. 662), but something "dependent on possession and analogous to the common-law lien of a land carrier" (The Bags of Linseed, 1 Black, at 112, 17 L. Ed. 35), and not arising "until some lawful contract of affreightment is made, and a cargo shipped under it" (The Freeman v. Buckingham, 18 How. at 188, 15 L. Ed. 341). We must now assume that the freight lien of American admiralty is less than a privilege because lost by unqualified delivery of possession, yet more than the possessory lien of common law because creative of jus in re rather than jus ad rem. Why this is so has long been no more than a curiosity of legal literature.

The affreightment contract before us presents more simply than would many modern charter parties with their numerous incidental and ancillary provisions this question: Is a maritime lien upon hull or cargo, as the case may be, the normal and lawful result of every legal claim of damage, due to any violation of the terms, express or implied, of a contract for carriage under which a carriage is ever actually be-

---

[1] This phrase is called by a recent commentator a "brocard du Cleirac," but "ce principe résulte de la lex Rhodia et du fragment d'Ulpien." Hennebicq, Principes de Droit Maritime Comparé, Brussels 1904, p. 316.

[2] For a summary (by Putnam, Circuit Judge) of ruling cases on nature of water carriers' liens, and its reciprocal nature, see Wellman v. Morse, 76 Fed. at 577, 22 C. C. A. 318.

gun? The inquiry must go this far, because no reason can be given for upholding the presently asserted lien that will not also support a multitude of other demands quite as close to the act of transport as is the one at bar, and all of them breaches of the maritime contract of af-, freightment.

It appears to us that: (1) The lien asserted is without historical basis in general maritime law; (2) it has been in substance rejected in America by a preponderance of authority; (3) is not in its nature beneficial to commerce, nor deserving of even statutory adoption—the only way it can obtain.

·1. English law may be disregarded;[3] if it had been followed a century ago, no question such as this could have arisen, as is abundantly shown by the opinions of Justice Story and sufficiently recognized in the Supreme Court decisions above named.

Having gone beyond the common-law lien of England, but not accepted the privilege of Continental Europe (as we assert), yet derived what we have rather from Europe than Britain, it may safely be said that, if no privilege arose from a given state of facts, no lien (in our sense) based on such facts, can be asserted to have historical foundation.

Before the codifications of the Empire, Pothier[4] set forth the accepted doctrine of privilege for freight, i. e., that cargo might be delivered and the privilege live for a fortnight unless during that time sale was made to a purchaser without notice. This passed into the Code de Commerce (section 191 et seq.) with the mutual privileges of carrier and shipper defined, i. e., the ship was privileged for freight and average (i. e., general) and the shipper for average and safe delivery—above all creditors,[5] and this allotment of privileges was and is restrictive.[6] But this limitation of rights in rem was not a creature of the Legislature, for section 191 "a completé les dispositions de l'ordonnance de 1681 en adoptant le Commentaire de Valin, et les solutions données par la jurisprudence,"[7] and that the Ordonnance de la Marine was a compiled statement of approved general sea customs is a matter needing no citation.

---

[3] Its present state as to the freight lien is well summarized in Scrutton on Charter Parties, §§ 101 and 105, while damages for detention or demurrage are by contract only. See a review of the cases in Crossman v. Burrill, 179 U. S. at 107, 21 Sup. Ct. 38, 45 L. Ed. 106, and cf., Dunlop v. Balfour, 7 Asp. M. C. 181.

[4] On the Maritime Contract, translation by Caleb Cushing, Boston, 1821.

[5] Hennebicq, ubi supra.·

[6] A l'égard de l'affréteur le privilège sur le navire est restreint aux dommages-intérêts qui lui sont dus pour les deux cas exprimés dans l'article 191; et à ·l'égard du capitaine le privilège n'existe sur le marchandises chargées, que pour le fret seulement." Caumont Dictionnaire du Droit Maritime, Paris 1867.

[7] Alauzet, Commentaire du Code de Commerce, Paris 1879, vol. 5, p. 52. And see Valin to the effect that no privilege existed in a shipper who for any reason took off his goods after lading or who was prevented from loading: "il est évident qu'a cet égard, sa créance est simple et ordinaire, sans aucune sorte de privilège" (quoted in Boulay-Patay, Paris, 1834, vol. 1, p. 150).

Nor was it permissible to enlarge privileges by analogy; like liens they have always been stricti juris.[8] There can, we think, be no doubt that never was a privilege properly awarded for an expense put on a shipper and not caused by physical damage to goods actually carried and by the act of transport.

The historical argument for libelant is substantially this: The law of the United States gives a lien for freight and demurrage irrespective of any stipulation (Davis v. Smokeless Fuel Co., 196 Fed. 753, 116 C. C. A. 381), and though demurrage strictly means an agreed price reserved in charter party or bill of lading (The J. E. Owen [D. C.] 54 Fed. at 186, Ben Franklin Co. v. Federal, etc., Co., 242 Fed. 43, 154 C. C. A. 635) and is therefore a creature of convention, the word is commonly used to cover damages for wrongful detention, and at both loading and discharging ports. The reason usually assigned for securing such nonconventional damages by a lien on cargo is that "demurrage is an extended freight," but that common phrase is a fiction, and no reason at all, yet the lien is certainly real enough, therefore it is urged that the fictional reason be disregarded, and the real lien mutualized, thus making the shipper's opportunity for liens on the ship coextensive, in time at least, with the shipowner's similar rights against the cargo.

The argument as to what ought to be will be considered later, historically, only what is possesses importance. The English rule of no lien for demurrage or detention except by explicit agreement was denied in The Hyperion's Cargo,[9] and the lien now universally recognized in the United States asserted, because the freight lien admittedly existed and detention damages were of the nature of freight, i. e., compensation for using a ship; and one who kept a ship idle was using her. History may have been misread, the reason given may have been bad, and its recognition as covering detention at loading port is perhaps anomalous (e. g., Carleton v. 367 Tons of Coal [D. C.] 206 Fed. 346); but, such as it is, it is the only reason for what is now commonly called the demurrage lien, and, if that reason does not aid libelant, the history of neither English nor continental admiralty furnishes assistance.

Without admitting that it is a fiction to identify demurrage and detention with freight, it is not only plain that this now historic American doctrine does not furnish ground for the lien here asserted, but the legal condition of "dead freight" in respect of lien affords strong historic argument against it.

"Freight, dead freight, and demurrage" are historically bracketed together in charters as the subjects of lien. No English or American court has (so far as we can discover) ever supposed that there was a lien for dead freight, and certainly there never was a privilege there-

8 Les privilèges sont de droit étroit. On ne doit jamais en cette matière argumenter par des conséquences ni par des identités, il faut que le privilège soit établi par la loi même" (Boulay-Patay, ut supra, p. 149). And for further citations as to privilege claimed by shipper for delay—and refused—see The Ripon City, 102 Fed. at 182, 42 C. C. A. 247.

9 2 Low. 93, Fed. Cas. No. 6,987, and affirmed as Donaldson v. McDowell, Holmes, 290, Fed. Cas. 3,985. It is no small tribute to the late Judge John Lowell that the lower court decision is the one always quoted.

for [10] by ancient maritime custom. The text-writers are unanimous as to its nonexistence (Parsons on Maritime Law [Ed. 1859] vol. 1, p. 244; Henry, Admiralty Courts of United States [Ed. 1885] p. 172), and it was so assumed in The Ripon City, supra.

One who agrees to load a full cargo and neglects to do it commits an especially plain breach of the affreightment contract, yet the carrier has no lien on what is laden, in respect of what is not. That a common-law or possessory lien could hardly exist on that which was not in possession is easily admitted,[11] but that no seaman or shipowner has (we believe) ever asserted such a maritime lien unsupported by charter party is the strongest evidence of the historic meaning of Cleirac's "clever phrase," i. e., that the mutual obligations of the personified ship and personified cargo begin when they are in charge of the same master, i. e., the captain, and cover only what occurs during that period of union. In the United States this union, in contemplation of law, begins when the ship is ready to receive cargo, and ends when a reasonable time has elapsed for putting it overside. And delay by the ship in discharging merely extends the charterer's or consignee's time wherein to receive—they have no cause of action (much less lien) against ship or owner for such delay (Milburn v. Federal, etc., Co., 161 Fed. 717, 88 C. C. A. 577, Empire, etc., Co. v. Philadelphia, etc., Co., 77 Fed. at 920, 23 C. C. A. 564, 35 L. R. A. 623), in the absence of special agreements to that effect. To hold that freight money or some substitute for it began a reasonable time after ship ready to receive cargo is now, whatever its original justification or lack of it, law; but the only reason ever given for the holding is no reason for granting a lien on a ship for refusing to go to a particular loading place.

We therefore think that the history of maritime jurisprudence affords no evidence that anywhere has the lien contended for been admitted.

2. Reported American decisions thought applicable are of two classes: (1) Those leaning for support on the maxim of The Freeman, supra, that the mutual rights (i. e., liens) of shipper and carrier do not arise until contract made and cargo shipped; and (2) those looking rather to the nature of the mutuality arising upon union of goods and ship, and deducing rights and liabilities therefrom. Cases of the first kind are germane to the contention that any breach of affreightment contract will support a proceeding in rem if and as soon as goods are laden; while the second class apply when libelant asserts his lien as the logical result of mutuality of remedy.

To make lien depend on its relation to a point of time, i. e., the date of delivery to ship, is perhaps fictional or mechanical rather than thoughtful, yet for lack of a better line of demarcation has long been well known in matters of statutory liens of mechanics and others.

In The Ask (D. C.) 196 Fed. 165, ship's alleged wrongful delay

---

[10] Caumont (supra) p. 179, expresses the opinion that under the Code Napoleon the captain might retain the cargo until his claim for empty spaces was satisfied. This is a very different thing from the privileges preserved from older law by the Code de Commerce.

[11] Phillips v. Ross, 15 East, 547, Birley v. Gladstone, 3 M. & S. 205.

caused waiting cargo to spoil, and, after lading, a lien was asserted for antecedent damages. The delay was adjudged excusable, but Mc-Pherson, J., pointed out that any lien came into existence "at the time injury was done," the necessary inference being that, as nothing was laden at date of injury, there was nothing to which the lien could then attach, and there certainly cannot be a lien in nubibus waiting to descend.

In Guffey v. Alaska, etc., Co., 130 Fed. 271, 64 C. C. A. 517, a shipper delivered his goods to a carrier and got a bill of lading for a particular vessel then at sea. That vessel never took the goods, but the delivery did not produce a lien. And to the same effect, under different facts, The Garonne, 160 Fed. 847, 87 C. C. A. 651.

In The Priscilla, 114 Fed. 836, 52 C. C. A. 470, libelant took passage on a steamer, and some hours before embarking delivered his baggage to the shipowner but not on shipboard. Some baggage was lost, but before it came aboard, and the passenger was duly carried as per agreement with the rest of his luggage; but he was by this court denied a lien for what had been lost.

The Hiram (D. C.) 101 Fed. 139, is considered authority against the lien here asserted, and The Habil (D. C.) 100 Fed. 120, expresses the same view. Hoadley v. The Lizzie (C. C.) 39 Fed. 45, presented facts appropriate for opinion, and lien was awarded; apparently the point was conceded.

In the second class of decisions are two of Judge Morris of the Maryland district, which undoubtedly hold with libelant, one a case of keeping cargo for a wrongfully delayed and chartered vessel, and the other of shutting out cargo. Decision goes on the nature of contract, as we read the opinion. The J. C. Stevenson (D. C.) 17 Fed. 540, The Alvah (D. C.) 59 Fed. 630, reversed on another point, 77 Fed. 315, 23 C. C. A. 181.

On the other hand, in The Eli Whitney, 1 Blatch. 360, Fed. Cas. No. 4,345, Justice Nelson affirming Judge Betts summarily denied a lien asserted by a shipper against a ship whose capacity had been falsely misrepresented to his injury as shipper. The point was necessarily involved, and, while the judgment is not reasoned, as authority there was nothing superior to the judges concerned at the date of decision.

The General Sheridan, 2 Ben. 294, Fed. Cas. No. 5,319, expresses on suggestive facts the opinion of Justice Blatchford that:

"Any duty that may be violated by the owner or master before the cargo is put aboard is not a duty of the vessel, and therefore the vessel cannot be in default."

In the S. L. Watson, 118 Fed. at 952, 55 C. C. A. 439, there was considered a contract by a transportation line to carry full cargoes by several boats, and all cargoes by some boat of the line, which contract was partially executed, but any lien against any or all boats of the line was refused in respect of cargoes shut out, the court remarking that no lien arose "except in connection with some visible occurrence relating to vessel or cargo."

The reasons of Addison Brown, J., for finding a lien for damages by delay to the return cargo on a chartered round voyage, in The

Giulio (D. C.) 34 Fed. at 911, are instructive, as is the discussion in The Ripon City, supra, though in neither case was the present point involved. But in both decisions, had the contention of the libelant here been accepted, or even thought of, it would certainly have been considered.

The weight of whatever authority exists is against libelant; and, indeed, considering how often similar disagreements have occurred, the novelty of the present claim is a potent argument against it.

3. This litigation exemplifies a common tendency to regard any floating property used in the performance of contract, as in some sort a pledge or surety for satisfactory performance; such security to be enforced by asserted maritime lien. No such principle is known to the admiralty. The ancient and customary lien of the sea is not maintained, nor was it created (so far as history reveals its origin) for the convenience or assurance of parties, but for the encouragement of commerce and shipping as a presumed benefit to the public, in respect of an occupation hazardous and uncertain beyond most land ventures.

In respect of carriage of goods in particular, every public benefit has for centuries been deemed obtained when goods were liable for freight, and ship for safe and sound delivery of goods, the mutuality of relation thus growing out of the act of transport, not the making of a contract for transportation. Anything more than this [12] multiplies secret liens and hampers instead of advances ease and freedom of commerce. Merchant and mariner alike subject their property to the municipal law of every country into which their venture comes, but a maritime lien is as near an approach to jus gentium as can be found in private jurisprudence, and any extension thereof not internationally well founded is to be opposed as jealously as is a denial of its accepted extent.

The foregoing considerations lead to affirmance with costs of the decree below.

[12] It is worth noting that in America we have also based the lien for general average on possession only, thereby following England rather than modern Continental Europe, Lowndes Gen. Av'ge, 5th Ed., p. 384; Coe Gen. Av'ge in U. S., p. 74. For French treatment, see Valin, infra, vol. 2, p. 535.

NOTE.—Valin Ed. 1828, by Becane, 2 vols., may be referred to for text of the Ordonnance. For correspondence with Code de Commerce see vol. 1, p. 397, and for the commentator's view of the origin of Cleirac's saying and limitations of privilege, vol. 2, p. 24.